THE TOLEDO NEWSPAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAN DIEGO SUN PUBLISHING COMPANY, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THE E. W. SCRIPPS COMPANY, TRANSFEREE OF SAN DIEGO SUN PUBLISHING COMPANY, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 110076, 110077, 110078. Promulgated September 30, 1943.

*Paul Patterson, Esq.*, and *W. H. Bemis, Esq.*, for the petitioners.
*John H. Pigg, Esq.*, for the respondent.

OPINION.

BLACK, *Judge*: As shown in our opening statement, the contested deficiencies result from the respondent's addition in Docket No. 110076 to the net loss disclosed by Toledo's return for 1938 of "Income received under sales agreement with The Toledo Blade Company dated August 1, 1938, $713,554.16"; and addition in Docket No. 110077 to the net loss disclosed by San Diego's return for 1939 of "Income received under a sales agreement with The Union-Tribune Publishing Company dated November 17, 1939, $483,180.46." Petitioners contest the entire dificiencies on the ground that both these adjustments are erroneous in their entirety.

Toledo contends that on August 1, 1938, it sold its newspaper business for a total consideration of $880,000; that the March 1, 1913, value of the intangible assets sold was not less than $880,000; and that it, therefore, realized no gain from the sale. The respondent contends that $780,000 of the consideration was for Toledo's covenant not to publish a newspaper in the city of Toledo for a period of ten years; that consideration for such a covenant represents ordinary income under section 22 (a) of the Revenue Act of 1938 rather than a gain or loss from the "sale or other disposition of property" under section 111; that Toledo is not, therefore, entitled to apply against such consideration any tax "basis" under section 111; and that, since the consideration of $780,000 was represented by forty noninterest-bearing notes payable over a period of ten years, the discounted value of such notes on August 1, 1938, was $613,554.16. The respondent also contends that $100,000 of the consideration was paid to Toledo for its intangible assets; that while this much of the consideration was from the "sale or other disposition of property" under section 111, Toledo has not proven any tax "basis" for the intangible assets sold; and that, therefore, the entire $100,000 is gain from the sale. It may be noted that this part of the total consideration mentioned in the August 1, 1938, contract was also represented by forty noninterest-bearing notes payable over a period of ten years and that the respondent did not discount these notes as he did the notes totaling $780,000, but no point is made by Toledo on this apparent inconsistency in the respondent's determination, and, there being no issue raised about it, we shall not discuss it further. The respondent does not contend that Toledo realized any taxable income in 1938 by reason of paragraph III (c) of the contract with the Blade, which provision has to do with the possible saving of taxes by the purchaser.

San Diego and the E. W. Scripps Co. contend that on November 17, 1939, San Diego sold its newspaper business for a total consideration of $570,000; that the March 1, 1913, value of the intangible assets sold was not less than $570,000; and that San Diego, therefore, realized no gain from the sale. The respondent contends that $450,000 of the consideration was for San Diego's covenant not to publish a newspaper in the city of San Diego for a period of seven years and six months; that consideration for such a covenant represents ordinary income under section 22 (a) of the Internal Revenue Code rather than a gain or loss from the "sale or other disposition of property" under section 111; that San Diego is not, therefore, entitled to apply against such consideration any tax "basis" under section 111; and that, since $420,000 of the $450,000 was represented by fourteen noninterest-bearing notes of $30,000, each payable on the first day of June and December of the years 1940 to 1946, inclusive, the discounted value of such notes on November 17, 1939, plus the cash payment of $30,000, was $363,180.46. The respondent also contends that $120,000 of the consideration was paid to San Diego for its intangible assets; that while this much of the consideration was from the "sale or other disposition of property" under section 111, San Diego and the E. W. Scripps Co. have not proven any tax "basis" for the intangible assets sold; and that, therefore, the entire $120,000 cash payment is gain from the sale.

We shall consider first the case of Toledo. The contract of August 1, 1938, specifically provides for two separate and distinct considerations. These considerations are fully stated in paragraphs ɪ and ɪɪɪ of the contract and are copied in our findings of fact and need not be repeated here.

Toledo's contention with respect to these two separate considerations included in the contract is in substance that where, as here, there is a sale of a business as a single transaction, gain or loss is to be computed by comparing the total selling price of such business with the seller's statutory basis, and that this rule is not changed by the fact that in the contract of sale the consideration for the sale of intangible assets was separately stated from the consideration for ceasing to publish petitioner's newspaper and its agreement not to compete for a period of ten years and other things agreed to be done in this paragraph of the contract, inseparable from the conveyance of the business and its good will as a going concern to the purchaser. One of the cases relied upon by petitioner to support its contention on this point is *Henry F. McCreery*, 4 B. T. A. 967. We think this case does support petitioner's contention as we have stated it above. In the *McCreery* case, among other things, we said:

* * * We consider it of no importance, in this connection, that the contract provides for the payment of a specific amount for the good will and the payment

of a further sum to be determined in the manner therein set forth, specifically for the tangible assets, but regard this as a mere agreement of the parties as to the manner in which the purchase price to be paid for the entire businesses, including good will and firm name, is to be determined. The gain or loss realized by the partnership upon the sale of its assets and businesses should be determined by comparing the selling price with the cost and the March 1, 1913, value of the entire assets, tangible and intangible, taken as a whole.

The substance of the general rule announced by the Board in the *McCreery* case we think should be applied to the particular facts of the instant case in computing gain on the transactions here involved.

Among the authorities strongly urged by the respondent to sustain his contention that the consideration named in the contract of sale for Toledo's agreement to cease publication of its newspaper and not to compete for a period of ten years was not to be considered as a part of the selling price of the newspaper, but must be considered as gross income under section 22 (a), Revenue Act of 1938, are *Cox* v. *Helvering*, 71 Fed. (2d) 987; *Salvage* v. *Commissioner*, 76 Fed. (2d) 112; affd., 297 U. S. 106; and *Beals' Estate* v. *Commissioner*, 82 Fed. (2d) 268, affirming 31 B. T. A. 966.

It is undoubtedly true that the above cases do hold that where a corporation sells out its going business to a purchaser and incidental to such transaction some officer or employee or stockholder of the selling corporation agrees with the purchaser that he will not compete for a given number of years with the purchaser of the business and the purchaser pays him a consideration for such agreement, the consideration thus received by the officer, employee, or stockholder of the selling corporation is taxable income to him under section 22 (a). The reason for this is that he himself has sold no capital asset but has simply received a sum of money for agreeing not to compete. The court in *Cox* v. *Helvering* well stated the reason for holding such a sum taxable income to the officer, employee, or stockholder receiving it, in the following language:

There is positively not one word in the record which would justify us in saying that the payment to petitioner was a capital transaction. If the $15,000 was paid to the selling corporation and distributed by it to its principal stockholder by some intracompany agreement, it might very well be designated, as the Commissioner designated it, a liquidating dividend, for in that case it would be a profit earned in the sale of capital assets. On the other hand, if it was paid directly to petitioner, as an ancillary agreement with the contract, it was to its extent a gain received by him in consideration of forbearing, rather than doing, personal services.

The conclusion we reach is consistent with the practice of the bureau over a long period of years, for as far back as 1920 it announced, through office decisions, the rule in such cases as follows: "Where a corporation sells its assets, including good will, to a competing corporation, one condition to the sale being an agreement by the president of the vendor corporation not to engage in similar business, for which he is paid a money consideration, the amount so received

by the president does not represent a conversion of capital, but is income for the year of its receipt." Commissioner's Bulletin 3, p. 93, O. D. 668.

Toledo contends that the above mentioned cases are distinguishable because the payments in those cases for promises not to compete were made to the stockholders of the selling corporation rather than to the selling corporation itself or to persons who were not the owner or seller of any business.

We think that petitioners are correct in contending that the above cases are distinguishable on their facts from the instant case. A reading of them will show (a) that the promise not to compete was unrelated to any sale made by the promisor and (b) that the promise not to compete did not operate as a restraint upon any property of the promisor and was not, therefore, an inherent part of anything sold by the promisor.

As a part of our findings of fact both as to Toledo and San Diego we have found upon evidence introduced by petitioners at the hearing that:

In the purchase of a newspaper business, as a going concern, it is customary that the purchaser require of the seller, in addition to the conveyance of the assets making up the newspaper business, tangible or intangible, or both, a covenant to refrain for a reasonable period from reentering into the business of publishing a newspaper within the territory in which the newspaper of the seller circulated at that time. This is necessary in order to prevent the seller from destroying the value of the good will of the business transferred.

Therefore, because of these and other facts included in our findings, we hold that the entire consideration received by petitioners under the contracts must be treated as one in computing petitioners' gain from the sale, and the Commissioner was not warranted in treating the consideration specified in paragraph I of the contract as income in its entirety under section 22 (a).

In addition to contending that the entire consideration must be treated as one in computing gain or loss, a contention which as above stated we sustain, Toledo also strongly argues that its going business was sold in 1938 at no greater price than its March 1, 1913, value, and therefore there was no taxable gain on the transaction. Petitioner urges in support of this contention the case of *Pfleghar Hardware Specialty Co.* v. *Blair*, 30 Fed. (2d) 614. In that case the court did hold that the Board erred in finding that there was no evidence to show what the March 1, 1913, value of the good will of the Pfleghar Hardware Specialty Co. was; the court further held that this March 1, 1913, value must be included as a part of the taxpayer's basis in determining gain, if any, from the sale; that the value of this good will as of March 1, 1913, was at least $113,888.25; and that the Board should have so found, and when this March 1, 1913, value of $113,888.25 for good will was used as a part of the taxpayer's basis there was no gain to it on the sale. While the *Pfleghar Hardware Specialty Co.* case,

*supra*, does support petitioner's contention that the March 1, 1913, value of its intangibles, including good will, must be considered in determining the gain, if any, which petitioner realized from the sale of its going business in 1938, it is needless to say that the March 1, 1913, value of intangibles, including good will, of a going business depends upon the evidence in each case. Merely because the court held in the *Pfleghar Hardware Specialty Co.* case that the sale price received for the going business in 1919 was less than its statutory basis, including March 1, 1913, value of good will, and therefore there was no gain on the sale, is no reason that we should so hold in the instant case. What we should hold in that respect depends upon the evidence in the instant case, and, for reasons which we shall presently state, we do not hold that the March 1, 1913, value of Toledo's intangibles, including its good will, was greater than the total price received in 1938 under the contract of sale.

We should perhaps point out that Toledo's basis for determining gain from the sale which it made is defined differently from its basis for determining loss. Its basis (unadjusted) for determining gain is cost or March 1, 1913, value, whichever is greater. Sec. 113 (a) (14), Revenue Act of 1938.[1]

Its basis as of March 1, 1913, for determining loss "is the cost or other basis provided for such property under section 113 (a) adjusted as required by section 113 (b), but without reference to the fair market value of the property as of March 1, 1913." Art. 113 (a) (14)–1, Regulations 101. Did Toledo realize any gain upon the sale involved in this proceeding, treating the entire consideration together as one, as we think it should be treated? Toledo does not claim that it sustained any loss upon the sale. Furthermore it has offered no evidence of its statutory basis for the computation of a loss, which is a prerequisite to the determination of any loss. As previously stated, its statutory basis for determining *gain* is cost or March 1, 1913, value, whichever is greater.

In its petition Toledo alleges that "The March 1, 1913 value of the intangible assets sold to The Toledo Blade Company under the contract of sale dated August 1, 1938 was not less than $880,000." The respondent contends that Toledo has proven no basis for either gain or loss and that his determination that the entire $100,000, specified as being paid to petitioner for intangibles, represents gain should be

---

[1] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(14) PROPERTY ACQUIRED BEFORE MARCH 1, 1913.—In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. \* \* \*

approved, as well as the amount received for the agreement to cease publication and not to compete for a period of ten years. In its brief Toledo argues in part as follows:

Since no physical property is involved in the instant case, and since no loss is claimed by the petitioner, the sole question is whether the value of the petitioner's business on March 1, 1913 was greater or less than its value on August 1, 1938. This is purely a matter of *comparative* value and actual values need not be determined. *Pfleghar Hardware Specialty Co.* v. *Blair*, 30 F. (2d) 614, 617-18, 7 A. F. T. R. 8462; *Fidelity Trust Co.*, 3 B. T. A. 292.

The parties have stipulated that Toledo "transferred to The Toledo Blade Company all of its intangible assets in accordance with said contract dated August 1, 1938." This would include any good will owned by Toledo on March 1, 1913. The applicable regulations on the sale of good will are Regulations 101, art. 22 (a)–10, and are printed in the margin.[2]

As a part of the record in this case the parties have placed in evidence Toledo's balance sheets for the five years prior to December 31, 1912, from which we find that Toledo's average tangible assets for that period were $387,595.82. The parties have also stipulated that Toledo's average income over the same period was $96,646.26.

In *Herald-Despatch Co.*, 4 B. T. A. 1096, 1107, one of the questions involved the determination of gain or loss from the sale of a newspaper business in 1920 which had been organized in 1890. There "The March 1, 1913, value of intangibles was determined by the Commissioner by deducting from the average earnings of the five years next preceding 1913 an amount equivalent to 8 percent of the average tangibles for the same period, and capitalizing the remainder at the rate of 15 percent." We approved that determination, which was based upon the formula (A. R. M. 34) referred to in the *Pfleghar* case. We have used this same formula in arriving at the March 1, 1913, value of Toledo's intangibles, including good will, set out in our findings of fact. See Mertens Law of Federal Income Taxation, vol. 10, sec. 59.42. In the section above mentioned the author, among other things, in discussing the use of formulae in determining the value of good will on a given date, says:

It is important to appreciate fully that the use of these formulae and the determination of the proper rates depend upon all the other existing factors of value. It is simply a method of determining a value by reference to the return which the investor would demand under all the circumstances involved. * * *

---

[2] ART. 22 (a)–10. *Sale of good will.*—Gain or loss from a sale of good will results only when the business, or a part of it, to which the good will attaches is sold, in which case the gain or loss will be determined by comparing the sale price with the cost or other basis of the assets, including good will. (See articles 111–1, 113 (a) (14)–1, 113 (b)–1, 113 (b)–2, and 113 (b)–3.) If specific payment was not made for good will there can be no deductible loss with respect thereto, but gain may be realized from the sale of good will built up through expenditures which have been currently deducted. It is immaterial that good will may never have been carried on the books as an asset, but the burden of proof is on the taxpayer to establish the cost or other basis of the good will sold.

We wish to make it clear that in using the formulae which we have used in the instant case in arriving at the March 1, 1913, value of Toledo's intangibles, including good will, we do not mean to indicate that is the only method to be used in arriving at the value of good will of a going business. There may be many other factors which should be considered in a given case. But in the instant case, under the evidence which we have before us, we feel that the only practicable way to arrive at the March 1, 1913, value of Toledo's intangibles, including good will, is by use of the formulae which we have used. The March 1, 1913, fair market value of Toledo's intangibles, including good will, set out in our findings of fact, is $437,590.60. This represents the basis (unadjusted) for determination of gain under section 113 (a) (14), *supra.* Section 113 (b) of the Revenue Act of 1938 provides:

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

The respondent does not contend that any of the "hereinafter" provisions referred to in section 113 (b), *supra,* are applicable in these proceedings.

No deduction for depreciation, including obsolescence, is allowable to a taxpayer in respect of good will. See art. 23 (1) (3), Regulations 101. Likewise, it has been held that a newspaper subscription list, because it has no definite life, is not subject to depreciation or obsolescence allowances. *Danville Press, Inc.,* 1 B. T. A. 1171. See also *Meredith Publishing Co.* v. *Commissioner,* 64 Fed. (2d) 890. Therefore, the March 1, 1913, value of petitioner's intangibles, including good will, which were sold in the contract of August 1, 1938, does not have to be adjusted for depreciation or obsolescence, if any, occurring between March 1, 1913, and the date of sale, for no deductions with respect thereto were allowable to Toledo in the computation of its net income during such period.

It follows that Toledo's gain from the sale of its newspaper business, coupled with an agreement to cease publication and not to compete for a period of ten years, will be computed by taking the total consideration received therefrom as determined by the Commissioner, $713,554.16, and subtracting therefrom $437,590.60, the March 1, 1913, value of Toledo's intangibles, including good will.

We shall now consider the case of San Diego. As far as principles of law are concerned, the contentions of the parties here are the same as in the case of Toledo, and we think it is unnecessary to restate them. The respondent does not question the proposition that, as in the case of Toledo, San Diego's basis for determining gain on the sale in 1939 of the intangible assets is the March 1, 1913, value of such assets.

Since the parties have tried and briefed the case on that proposition, we are not inclined to question its correctness. In its petition San Diego alleges that "The March 1, 1913 value of the intangible assets sold to The Union-Tribune Publishing Company by the petitioner was not less than $570,000," and, therefore, there was no gain to San Diego in the transaction. The respondent contends that no March 1, 1913, value has been proven. Applying the same formula as we used in the case of Toledo, we have found that the March 1, 1913, value of San Diego's intangible assets, including good will, was the amount of $57,082.80. See *Pfleghar Hardware Specialty Co.* v. *Blair, supra.*

It follows that San Diego's gain from the sale of its newspaper business, coupled with an agreement to cease publication and not to compete for a period of seven years and six months, will be computed by taking the total consideration received from the transaction as determined by the Commissioner, $483,180.46, and subtracting therefrom $57,082.80, the March 1, 1913, value of San Diego's intangible assets, including good will. Since it has been agreed by the parties that the E. W. Scripps Co. is liable as transferee of the property of San Diego for any deficiencies in income tax and excess profits tax, plus interest, that may be determined to be due from San Diego in Docket No. 110077, that fact will be given effect in a decision under Rule 50.

*Decisions will be entered under Rule 50.*