OPINION. ARNOLD, Judge: In his brief respondent contends that the business and assets transferred by the trust estate to the partnership had a fair market value of $639,372.94.[1] He contends, further, that the trust estate received only $382,040.26 as consideration therefor, and that the difference of $257,332.68 was, in effect, a taxable distribution to the beneficiaries of the trust estate under sections 22 (a) and 115 (a) of the Internal Revenue Code. He points to the trust estate’s undistributed earnings and profits on November 1, 1940, of not less than $276,988.48 as proof of its ability to make the distribution. Petitioners contend that the fair market value of the business and assets, less liabilities, of the trust estate on November 1,1940, was not in excess of $450,851.24; that the partnership paid $450,851.24 for the business and assets of the trust estate by the payment of $3,000 cash and notes worth $447,851.24; that the sale, even if made at less than fair market value (which petitioners deny), did not effect a distribution by the trust estate to one or more partners “of earnings and profits taxable as a dividend” under sections 22 (a) and 115 (a) of the Internal Revenue Code, or Regulations 103, section 19.22 (a)-l. The first question to be decided under the opposing contentions is the value of the business and assets transferred. Both parties accept the net worth per books as a yardstick for measuring assets transferred except good will. The dispute between them is over including and valuing good will as one of the assets transferred. Respondent has followed the formula set forth in A. R. M. 34,2 C. B. 31, except that he allowed a return of 8 per cent on net tangibles and capitalized the remaining earnings at 15 per cent instead of 10 per cent and 20 per cent, as prescribed by A. R. M. 34. The substitution of the rates used for the rates in the formula is justified by respondent by their use in numerous decided cases and by his determination that trust estate’s business was not of a hazardous nature. On the question of good will, petitioners contend, first, that the trust estate had no good will; secondly, that if good will existed, it was personal to John Q. Shunk; and, finally, that if good will is to be valued by a formula, respondent used the wrong rates and period of years. We agree with respondent that the trust estate had good will. The trust estate’s earnings record over a period of years in an industry which the witnesses testified was hazardous or semihazardous speaks eloquently of the existence of good will. The testimony shows, and we have found, that the trust estate employed no solicitors. Its business was secured principally by letters written by office personnel. The management and the products of the trust estate must have been well and favorably known to support a business which has grown steadily-for over 50 years in the strongly competitive earth-moving and construction equipment field. The absence of a value for good will on the books of the trust estate does not prove that there was no good will, nor prevent its valuation if good will in fact exists. R. E. Baker, 37 B. T. A. 1135, 1149. The volume of orders on hand at the time the trust estate transferred its assets and business to the partnership was not established, but it seems clear that it was substantial, in view of the large volume of orders on hand in August 1943, when the partnership’s assets and business were sold to outside interests. It is earnestly contended that this sale, within less than three years of October 31, 1940, establishes the nonexistence of a good will asset, since profits between the two transfers greatly exceeded the profits of any year prior to, and including, the fiscal year 1940. The logic of this argument fails before the inescapable fact that the purchasers in 1943 were seeking machinery and equipment difficult, and in some instances, impossible, to acquire, due to the impact of the war. It may well be that as to that sale the situation was comparable to that which existed in Watab Paper Co., 27 B. T. A. 488, 504, where we refused to fix a separate value for good will because of the liberal valuations allowed on the tangible assets transferred. In any event, this record convinces us that the trust estate tránsferred good will as a part of its assets and business, and that such good will had a value when acquired by the partnership. Petitioners’ second contention with respect to good will is that any good will that existed was personal to John Q. Shunk. It has long been recognized that the personal ability, skill, experience, acquaintanceship, or other characteristics and qualifications of individuals connected with the business do not constitute good will items transferable as property. Providence Mill Supply Co., 2 B. T. A. 791; Howard B. Lawton, 6 T. C. 1093; reversed on other grounds, 164 Fed. (2d) 381; Floyd D. Akers, 6 T. C. 693. Petitioners insist that the earnings of the trust estate in excess of a normal rate of return were attributable to John Q. Shunk’s conduct of the business. They point to the low cost of operating, to the excellent employer-employee relationships and nonunion status of the employees, to the fact that the employees were personally known by name to John Q. Shunk, Mary E. Gardiner, and Gale Fegley, all of whom had grown up in Bucyrus, to the family nature of a business conducted in a small town, and to the many personal contacts between management and employees, as proof that the personal element was the principal component of any item of good will. Further, petitioners point to John Q. Shunk’s long experience with the trust estate and its predecessors, his experiments with steel to improve the company’s products, his attendance at conventions of dealers in road equipment, and his personal acquaintance with road equipment people, as personal attributes of John Q. Shunk from which the business benefited, but which were not susceptible of transfer as a business asset. Conceding for the sake of argument (and the concession is only for that purpose) that all the things said about John Q. Shunk be true, it is still short of the situation dealt with in the Lawton case, supra, where one of the witnesses/testified that, so far as he was concerned, without the Lawtons he didn’t know anything about the company. We could concede that John Q. Shunk was an able executive, maintained excellent relations with the employees, and operated the business well, without disproving respondent’s determination that the trust estate had a valuable good will. Actually, these attributes should assist in creating good will. Such attributes are expected by business concerns from its management. The record here shows that John Q. Shunk provided the trust estate with competent and able management. The record does not show that John Q. Shunk personally was responsible for the business. We can not, therefore, hold that good will existed only because of John Q. Shunk’s personal following, reputation, ability, and experience. Petitioners’ final.attack is leveled at the rates and period used by the respondent in valuing good will by a formula. Petitioners argue that the rates should be 10 per cent and 20 per cent, as used in A. R. M. 34. Respondent has used 8 per cent and 15 per cent, as shown in our footnote, supra. Petitioners also argue that the period for averaging income and net tangibles should be the nine fiscal years 1932-1940, inclusive, whereas respondent has used the five-year period preceding the fiscal year 1940. As early as Dwight & Lloyd Sintering Co., 1 B. T. A. 179, we pointed out that the period and the rates to be used were questions to be determined from all existing facts and circumstances. The decided cases repeatedly point out that the use of for-mulae and the determination of the rates to be used constitute but one method of valuing good will and that all other existing factors of value must be taken into account.[2] Considering all factors of record, we have found the value of good will to be $110,194.80. The value of the business and assets transferred to the partnership, therefore, was $561,046.04. The next question is whether the notes given by the partnership as part of the consideration for the business and assets had a value equal to their face value of $447,851.24. In view of our decision on the first point, the partnership’s assets, when the notes were executed, exceeded $560,000, i. e., assets per books, $450,851.24, plus good will, $110,194.80. In addition the individual partners were liable on the notes. We are uninformed as to the financial ability of each partner to respond, although there is testimony of record as to the property owned by Mary E. Gardiner and Gale Fegley. Nevertheless, we do know that petitioners, as sole owners of the trust estate, would ultimately receive any amounts paid on the notes. On the other hand, as owners of a five-sixths interest in the partnership, petitioners would be personally liable for any default on the notes. The principal parties at interest, therefore, are the petitioners, who are co-makers of the notes and at the same time the only persons beneficially interested in the proceeds therefrom. We have no doubt that petitioners regarded the face value of the notes as their fair market value. But, as has been repeatedly stated in decisions of this and other courts, the test of fair market value is what the property will bring in a sale between willing parties dealing without compulsion. Considering the substantial asset Values behind the notes and the personal liabilities of the several partners on the notes, the principal factor adversely affecting their value is their extended terms. It is well established that the present value of a dollar due at some time in the future decreases as the maturity date is postponed. This principle is recognized in financial and business circles by discount tables at varying rates and periods of time. The parties here have recognized this business principle by stipulating the rate of discount to be used if we determine that the facts require application of the principle. The parties have also stipulated that at the agreed rate of discount the present value of the notes for their terms at November 1,1940, was $379,040.26; and that the present value of the notes on November 1, 1940, if discounted for the period during which they were outstanding and unpaid, was $420,600. While we know now that the notes were paid in full within three years from the date they were executed, a buyer at November 1,1940, would have had no such assurances. So far as he could tell, he would have to wait ten years for payment of the notes. During this period conditions could change to such an extent that the debtor would be unable to pay. It is unreasonable to suppose, therefore, that the buyer would purchase for more than the discounted value of the notes based on their extended terms. On this point we agree with the respondent that the discounted value of the notes is $879,040.26. The final question is whether the difference of $179,005.78 between the fair market value of the business and assets transferred and the selling price should be considered a dividend distribution by the trust estate to its beneficiary-stockholders, the petitioners herein. The transfer effected a business reorganization, but it was not followed by the dissolution of the association taxable as a corporation, as so frequently happens in this type of transaction. See E. C. Huffman, 1 B. T. A. 52; Estate of D. F. Buchmiller, 1 B. T. A. 380. Nor can we say here, as in the last cited cases, that the interests in the successor partnership were identical with the stockholders’ interests in the corporation. Here the former stockholders held only a five-sixths interest in the partnership as against the entire interest in the trust estate. This variance in interests owned is not, however, fatal to respondent’s contention, nor is the continued existence of the trust estate dispositive of our question. In Palmer v. Commissioner, 302 U. S. 63, the Supreme Court held that a sale of corporate assets by a corporation to its stockholders “for substantially less than the value of the property sold,, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend. The necessary consequence of the corporate action may be in substance the kind of distribution to stockholders which it is the purpose of section 115 to tax as present income to stockholders, and such a transaction may appropriately be deemed in effect the declaration of a dividend, taxable to the extent that the value of the distributed property exceeds the stipulated price.” The selling price of the business and assets was $3,000 cash plus notes having a fair market value of $379,040.26. The fair market value of the business and assets transferred by petitioners as sole owners and beneficiaries of the trust estate was $561,046.04. Therefore, property was transferred by the trust estate taxable as a corporation to a partnership, a five-sixths interest in which was owned by the former stockholder-beneficiaries. The selling price was substantially less than the fair market value of the property transferred. Having in mind the holding in the Palmer case and other cases of like tenor,[4] it is our opinion that the consequence of the trust estate’s action was in substance a distribution to its stockholder-beneficiaries which section 115 was designed to reach and tax as present income to the stockholder-beneficiaries. In the light of the Palmer decision, the transaction here “may appropriately be deemed in effect the declaration of a dividend.” The “dividend,” which under our decision amounted to $179,005.78, should be taxed to petitioners in proportion to their interests in the trust estate. Reviewed by the Court. Decision will be entered wnder Bule 50. Johnson, J., did not participate in the consideration of or decision in this report. Respondent’s Exhibit CC shows his valuation of the business and assets, as of November 1, 1940, as follows : Capitalization of good will_$188, 521. 70 Net worth per boots_ 450, 851. 24 Total value- 639, 372. 94 Good will was valued by averaging net tangible assets exclusive of investment assets at the beginning of the fiscal years ended October 81, 1935 to 1939, inclusive, and by averaging income less income taxes for the same fiscal years as follows: Average income, $53,235.50; average net tangibles, $311,965.39; by allowing an 8 per cent return on net tangibles, or $24,957.23; and by attributing the remaining income of $28,278.27 to good will, which, capitalized at 15 per cent, gave a fair market value for good will of $188,521.70. Herald-Despatch Co., 4 B. T. A. 1096; Otis Steel Co., 6 B. T. A. 358; Schilling Grain Co., 8 B. T. A. 1048, where Board fixed round sum slightly under figure resulting from capitalization of earnings; Kaltenbach & Stephens, Inc., 12 B. T. A. 1009; Toledo Newspaper Co., 2 T. C. 794; Ushco Manufacturing Co. v. Commissioner, 151 Fed. (2d) 821, affirming Tax Court memorandum opinion; Central National Bank of IAncoln, Nebraska, 29 B. T. A. 719 ; Shanley & Furness, Inc., 21 B. T. A. 146; St. Louis Screw Co., 2 B. T. A. 649; Mossman, Yarnelle & Co., 9 B. T. A. 45; C. F. Hovey Co., 4 B. T. A. 175. Timberlake v. Commissioner, 132 Fed. (2d) 259; Elizabeth Susan Strake Trust, 1 T. C 1131; cf. Langstaff v. Lucas, 9 Fed. (2d) 691.