FOSTER G. BEAMSLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

INEZ L. BEAMSLEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23536, 23537. Promulgated September 12, 1952.

Spaulding Glass, Esq., and Theodore R. Scott, Esq., for the petitioners.

Harold H. Hart, Esq., for the respondent.

994

## OPINION.

RAUM, *Judge:* Petitioners Foster G. and Inez L. Beamsley are husband and wife. From 1934 until September 1939, Mr. Beamsley and R. H. Johnson controlled the affairs of Transportation Underwriters Agency, Inc., the stock of which, except for some qualifying directors' shares, was held by their wives, Mrs. Beamsley and Mrs. Johnson. Underwriters was organized to act as an agent or broker in the sale of insurance, from which it derived income in the form of commissions. Its most important customers were in the bus transportation industry, and a very substantial portion of its income came from insurance sold to National City Lines, Inc., with which Mr. Beamsley was closely connected, and which controlled a large number of companies operating bus lines. National placed its insurance with Underwriters from 1936, when National was organized, through 1946, after which it adopted a system of self-insurance.

Friction had arisen between Mr. Beamsley and Mr. Johnson, an important element of which was Mr. Johnson's charge that Mr. Beamsley was not giving any attention to the insurance business and was not earning his salary. Mr. Johnson had threatened to cause liquidation

of Underwriters and to start a new insurance business of his own. The matter came to a head in September 1939, when the Beamsleys completely withdrew from Underwriters in accordance with an agreement executed on September 11, 1939, by the Beamsleys, the Johnsons, and Underwriters. The agreement undertook to deal comprehensively with all phases of the situation. Among other things, Mr. Beamsley agreed to resign as an officer and director of Underwriters as of January 1, 1939, and Underwriters agreed to pay him the balance of his salary for 1938, which had theretofore been in dispute; Mrs. Beamsley and her daughter Martha (to whom Mrs. Beamsley had given one-half of her stock interest in Underwriters two days earlier) agreed to surrender their stock to Underwriters; Underwriters agreed to give to each of Mrs. Beamsley and Martha 544¾ shares of common stock in National City Lines, Inc., as well as $2,091.88 in cash, and to assign to each of them $5,357.93 of the amount due to it by Mr. Beamsley on account of insurance premiums which it had previously paid for him; and Underwriters agreed also, in paragraph 7, to pay to Mrs. Beamsley, during the joint lives of Mr. Beamsley and Mr. Johnson or for 5 years from July 1, 1939, whichever might be longer, an amount equal to one-half of the gross commissions earned by it on account of insurance policies written for National, its officers, employees, subsidiaries, and affiliates.

The present proceedings grow out of the payments (representing one-half the commissions on National's business) made to Mrs. Beamsley during 1945 and 1946 pursuant to paragraph 7 of the foregoing agreement. The Commissioner contends that these payments constitute income to Mr. Beamsley, whereas both petitioners contend that the payments must be ascribed to Mrs. Beamsley rather than to Mr. Beamsley and that they constitute capital gain to her rather than ordinary income. In short, petitioners contend that these payments were merely part of the price at which Mrs. Beamsley disposed of her stock in Underwriters. The Commissioner denies that these payments are part of the purchase price for the Underwriters stock; his principal contention is that they were made in consideration of such assistance or cooperation as might be forthcoming from Mr. Beamsley in assuring the continuance of National as a client of Underwriters.[1] The question is predominantly one of fact, and, after a careful study of the entire record, we have reached the conclusion that the payments

---

[1] Such payments had been reported each year by Mrs. Beamsley as ordinary income. Subsequently, she filed claims for refund for several years, including 1945, on the ground that the payments should have been reported by her as capital gain. These claims were allowed by the Commissioner, and refunds were made to her. The Commissioner's position herein constitutes a reversal of his prior position; in essence, he says that he was wrong in the action which he had heretofore taken in this connection, since the payments involved were not in fact made as consideration for the surrender of Mrs. Beamsley's stock, but had their source in Mr. Beamsley.

did not represent a part of the purchase price paid for Mrs. Beamsley's stock, but were attributable to Mr. Beamsley.

Mr. Beamsley had never sold insurance, and at no time was he licensed to do so. Johnson was the only one at Underwriters who had such a license and who actually made sales of insurance for Underwriters. But Mr. Beamsley had been in intimate contact with the bus transportation industry since the 1920's, and he used his contacts with that industry to put Johnson in touch with potential purchasers of insurance. Johnson would then attempt to sell insurance to the prospect, and would service the insurance thereafter, if he succeeded in making the sale. Mr. Beamsley also rendered other services for Underwriters, such as advising it on investments and managing its interests in oil properties.

Although the decision as to where National would place its insurance was made by its president, E. Roy Fitzgerald, we are unable to believe, on the evidence, that Mr. Beamsley was not in a position to influence that decision. He was a vice president of National, in charge of its financial operations; he was also a director and stockholder of National; he had known Fitzgerald for many years, was friendly with him, and had been brought into National's organization by Fitzgerald; and, as Mr. Beamsley testified, among other things "Naturally, we talked about the insurance." He was not only in a strategic position to make affirmative suggestions in regard to the original placement of National's insurance, but thereafter, as that insurance expired periodically, he could influence its further placement at Underwriters, if only by a course of inaction and silence through which he refrained from exercising his influence in favor of some broker other than Underwriters. It may well be true that Fitzgerald would not have placed National's insurance with Underwriters at the outset, and he would not have renewed it there each year thereafter, unless Underwriters provided low rates and good service. But there is no satisfactory evidence in the record before us that there were no other brokers who could have matched Underwriters' rates and otherwise competed for National's business. Petitioners are wide of the mark when they argue that Mr. Beamsley could not have forced Fitzgerald to place National's business with Underwriters. The point is that, other things being equal as far as rates, etc., were concerned, Mr. Beamsley was in a position where he could, either by subtle hints or forthright recommendations to Fitzgerald or even by inaction at times, exert a powerful influence in relation to the retention of Underwriters as National's insurance broker. And we think that the payments provided for in paragraph 7 of the agreement were intended as compensation for such influence. Moreover, even if such influence were virtually nonexistent, as petitioners insist, the significant thing

is that Johnson thought it was real, that Beamsley knew of Johnson's belief, and did nothing to contradict it.[2]

It was this understanding that prevailed between the bargaining parties and it was on this understanding that the payments in issue came to be made. Beamsley's influence, whether real or supposed, over the placement of National's insurance was responsible for those payments. On the Beamsley's side, he was the source of those payments. Of course as a matter of detail he could, as he did, arrange to have them paid to his wife rather than to himself. Nonetheless they remain taxable as his income. Cf. *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Eubank*, 311 U. S. 122; *Harrison* v. *Schaffner*, 312 U. S. 579; *Commissioner* v. *Sunnen*, 333 U. S. 591, 603 *et seq.; Corliss* v. *Bowers*, 281 U. S. 376, 378; *Schermerhorn Oil Corporation*, 46 B. T. A. 151, 162 *et seq.*

Although the contention is made that these payments, if taxable to Mrs. Beamsley, give rise to capital gain rather than ordinary income, no comparable claim is made with respect to Mr. Beamsley, either as error alleged in the pleadings or as part of the argument on brief, in the event the payments are found to be taxable to him. Concluding that these payments must be treated as his income, we hold them taxable to him as ordinary income.

In addition to the various provisions of the agreement of September 11, 1939, already mentioned, Mr. and Mrs. Beamsley covenanted that they would not engage in the insurance brokerage business so long as the payments provided for in paragraph 7 were made to Mrs. Beamsley. Petitioners contend that no part of these payments is attributable to the covenant not to compete (cf. *Ethyl M. Cox*, 17 T. C. 1287), and that, if it be otherwise, the covenant is not capable of severance from the rest of the agreement in such a way as to cause the payments, or the portion of them allocable to the covenant, to be taxable as ordinary income. Cf. *Toledo Blade Co.*, 11 T. C. 1079, affirmed *per curiam*, 180 F. 2d 357 (C. A. 6), certiorari denied, 340 U. S. 811; *Toledo Newspaper Co.*, 2 T. C. 794; *Aaron Michaels*, 12 T. C. 17; *Rodney B. Horton*, 13 T. C. 143, appeal dismissed, 180 F. 2d 354 (C. A. 10). These are not questions, however, which confront us in the disposition of this case, and there is no need to pass on them. In

---

[2] Petitioners argue that it is common practice to sell insurance brokerage business and to measure the purchase price by commissions to be received in the future. We think that is quite true, but that was not the situation here as we view the facts. Not only does the evidence show that in such sales the commissions are usually taken into account for a comparatively short period of years as contrasted with a potential period here covering the joint lives of Beamsley and Johnson, but the commissions involved here did not relate to all of the insurance sold by Underwriters. The commissions which were the measure of the payments in paragraph 7 were strictly limited to the insurance emanating from National. We think that paragraph 7 reflected an understanding that Mr. Beamsley controlled that business or was a significant factor in the retention of that business, and that the payments were not made as part of the purchase price of Mrs. Beamsley's stock.

the cited cases the controversy was over the nature of the income—whether ordinary, or capital gain—and not, as here, to whom the income is taxable. Cf. *Beals' Estate* v. *Commissioner*, 82 F. 2d 268, 270 (C. A. 2); *Cox* v. *Helvering*, 71 F. 2d 987, 988 (C. A. D. C.). Our conclusion, that the payments are taxable to Mr. Beamsley, as ordinary income, does not depend on a resolution of these questions concerning the covenant not to compete. We are moved rather by the facts, which the record makes plain to us, that Mr. Beamsley was the source of these payments, and that they were not made in consideration for the surrender of Mrs. Beamsley's stock.

The tax on these payments being due from Mr. Beamsley, it is not also owing by Mrs. Beamsley. As a precautionary measure pending the outcome of this controversy, respondent has charged the payments to both petitioners as ordinary income, and, since the deficiencies asserted against Mrs. Beamsley result entirely from this action, she is entitled to a decision adjudging no deficiency to be owing by her. Furthermore, for 1945 and 1946, the years in issue, Mrs. Beamsley paid a tax on these payments as capital gain, and the pleadings pray, if the payments are ruled taxable to Mr. Beamsley, for a finding that Mrs. Beamsley is entitled to a refund. We cannot direct a refund, but we can determine the amount of an overpayment within the provisions of section 322 (d) of the Internal Revenue Code, which will be taken into account in the decision to be entered under Rule 50.

*Decision will be entered for the respondent in Docket No. 23536.*
*Decision will be entered under Rule 50 in Docket No. 23537.*

