Estate of F. G. Masquelette, Deceased, Houston Bank & Trust Company, Executor, and Sarah Olive Masquelette v. Commissioner. Edwin L. Bruhl and Lillian Marie Bruhl v. Commissioner.
Estate of Masquelette v. Commissioner
Docket Nos. 31543, 38288.
United States Tax Court
T.C. Memo 1955-221; 1955 Tax Ct. Memo LEXIS 114; 14 T.C.M. (CCH) 879; T.C.M. (RIA) 55221; August 9, 1955
*114 Aaron Goldfarb, Esq., for the petitioners. John P. Higgins, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinions These consolidated proceedings involve deficiencies in income tax for 1948 as follows: Petitioner
Docket No.
Deficiency
Estate of F. G. Masquelette, deceased, Houston
Bank & Trust Company, Executors, and Sarah
Olive Masquelette
31543
$206.52
Edwin L. Bruhl and Lillian Marie Bruhl
38288
289.50
The questions presented are (1) whether the proceeds received by petitioners during the taxable year 1948, upon the sale of their respective interests in the intangible assets of an accounting business which petitioners operated as a partnership, together with a covenant not to compete, are taxable as ordinary income or as capital gain; and (2) whether the petitioners erred in reporting in 1948 all of the income of the El Paso partnership including fees earned but uncollected as of May 1, 1948, the date of the transfer of their respective interests. Findings of Fact The stipulated facts are found accordingly. Petitioners Edwin L. Bruhl and Lillian Marie Bruhl, husband and wife, are residents of Houston, Texas, *115 and filed their joint income tax return for 1948 with the collector of internal revenue for the first district of Texas. The Houston Bank & Trust Company is the duly appointed and qualified executor of the estate of F. G. Masquelette, who died on November 9, 1953, at the age of 80 years. The joint income tax returns for 1948 for F. G. Masquelette, deceased, and Sarah Olive Masquelette, his wife, was filed with the collector of internal revenue for the first district of Texas. Prior to the year 1934 F. G. Masquelette, hereinafter referred to as Masquelette, was the sole owner of a public accounting business, F. G. Masquelette & Company, which had its principal office in Houston, Texas, and a branch office in El Paso. Masquelette was an accountant of many years' experience and was held in esteem as such in and around south and west Texas where he conducted his business. The Houston and El Paso offices had been operated under the same name since the years 1909 and 1912, respectively. In 1934 petitioner Edwin L. Bruhl, hereinafter referred to as Bruhl, became a partner in the El Paso office and from that date the business was operated as a partnership between Masquelette and Bruhl, *116 the latter being designated as the resident partner. The books and records of the El Paso partnership were kept, and income tax returns were filed, on the cash basis of accounting, although a record of fee earnings was maintained on an accrual basis in order to determine at any given time the respective equity of each partner in uncollected fees. During the latter part of 1939 Bruhl became a partner with Masquelette in the Houston office. During the year 1941 Masquelette, Bruhl, and one Guy A. Douglass, who was then manager of the El Paso office, formed a partnership with respect to a new office in Albuquerque, New Mexico. In February 1943 Bruhl went on active service with the army and, in anticipation of his being absent for several years, Douglass was made a resident partner of the El Paso office and assumed full charge thereof during Bruhl's absence. Upon his return from service in the summer of 1945 Bruhl resumed his duties as an active partner at the Houston office. Thereafter, and during 1946, 1947, and the first six months of 1948 Bruhl spent approximately 90 per cent of his time in Houston and the remaining 10 per cent between the El Paso and Albuquerque offices. During *117 the period 1943 through April 30, 1948, there were three partnerships doing business under the name of F. G. Masquelette & Company. The Houston partnership was designated "F. G. Masquelette & Company of Houston"; the El Paso partnership was designated "F. G. Masquelette & Company of El Paso"; and the Albuquerque partnership was designated "F. G. Masquelette & Company of Albuquerque". Each partnership kept separate and distinct records for purposes of accounting and income tax reporting. On October 1, 1945, Masquelette, Bruhl, and Guy A. Douglass entered into a written partnership agreement with respect to the El Paso partnership. Masquelette and Bruhl were designated as "nonresident general partners", and Douglass as "resident general partner". The nonresident partners agreed to furnish all of the capital requirements on a fifty-fifty basis. The agreement provided further in pertinent part as follows: "VIII "Any Partner may terminate the Partnership by giving to the remaining Partners sixty days notice in writing. In such an event, the retiring Partner's drawing account and interest in the partnership profits shall cease at the expiration of the sixty-day period. In such an *118 event, the partnership books shall be brought up to the effective date of termination on a sound accounting basis (accrual), and the respective interests of the various partners in the tangible assets (cash, receivables, fixtures, investments, etc.) shall be computed. The two remining [reminding] partners shall have the right, but not the obligation, to acquire the rights of the retiring partner both in the Tangible and Intangible Assets of the Partnership at a price computed as follows: "(1) Actual book value of interest of the retiring partner in the Tangible Assets of the Partnership, always evidenced by the credit balances in the respective Capital Accounts of the Partners at the close of the fiscal year or at such date as it becomes necessary to close the books, after adjustment of such credit balances to reflect 'book value' of office furniture and fixtures, etc. "(2) An amount equal to one-third of the average annual net fees (defined as gross collectible billings less travel and incidental expenses included in such billings) earned by the Partnership during the five twelve-month periods ending with the effective date of termination of the retiring Partner's association *119 in the Partnership. * * *
"X "It is one of the expressed purposes of this agreement that the accounting organization now operating in El Paso under the name of F. G. MASQUELETTE & COMPANY shall continue to function even after the death or retirement of one or more of the present General Partners. It is, therefore, expressly provided that, so long as payments are made to the retiring partners as provided in preceding paragraphs of this agreement, the majority of the General Partners as of any date shall have the right and title to the use of the trade-name of 'F. G. Masquelette & Company in the territory then being served by the El Paso Partnership, except that, so long as either of them shall live that name may not be used by partnerships composed of others not including F. G. Masquelette and/or Edwin L. Bruhl, excepting upon their express written permission, or through exercise of the right of either of them to retire from the Partnership as provided in Paragraph VIII and the payments to him of the amounts stipulated therein. Upon the retirement or death of any one of the partners, the remaining partners shall have the right and title to the use of the trade-name of 'F. G. *120 Masquelette & Company' in the territory then being served by the El Paso Office. * * * "XII "Nothing herein shall prevent the final dissolution of the Partnership by the unanimous agreement of the Partners, or by operation of law. The rights of the various Partners, in such event, shall be limited to their rights in the tangible assets and accumulated profits. In such an event, the right to the exclusive use of the trade name of F. G. MASQUELETTE & COMPANY or any derivative of that name in the El Paso territory or elsewhere shall revert to F. G. Masquelette and Edwin L. Bruhl, or the survivor, and they shall have the right to continue a public accounting practice in the territory theretofore served by the Partnership composed of F. G. Masquelette, Edwin L. Bruhl and Guy A. Douglass, under the same trade name, so long as the obligations imposed on continuing Partners, as set out in Article VIII, are carried out. It is specifically agreed that, in the event of dissolution under this paragraph, the continuing new Partnership of F. G. Masquelette & Company shall have the right and title to the possession and use of the office quarters being occupied by the terminated Partnership as *121 of date of termination, to all the files, correspondence, working papers, copies of tax returns and copies of reports, which have been accumulated in the operation of the office, and any leases in connection with such property shall become the property of the new Partnership, and that payments, other than for the retiring Partner's equity in the tangible assets, are conditioned upon said retiring Partner not engaging in the practice of public accounting on his own account, for, through, or in association with others, in the territory then being served by the El Paso Office or any of its associated Offices, the number of such payments, and required abstenance [absence] from competitive practice being limited to 100 months." On October 1, 1946, G. M. Oliver and R. A. Douglass (brother of Guy A. Douglass) were admitted as "Special Partners" in the El Paso partnership, as was H. E. Hughes on October 1, 1947. In early 1948, as a result of an unfortunate and embarrassing circumstance arising in the Albuquerque office, both Masquelette and Bruhl resolved to maintain more adequate review and control over that office, as well as the one in El Paso. After making a trip to visit the El *122 Paso office Bruhl learned that the local partners there were dissatisfied with having their work supervised by nonresident associates and were planning to leave Masquelette & Company of El Paso and to form a new accounting firm. Bruhl also learned that unless he could personally move back to El Paso and devote most of his time to that office, it would thereafter be impossible to maintain a profitable accounting practice in El Paso in competition with R. A. Douglass, Oliver and Hughes, since substantially all of Masquelette's El Paso clients indicated an intention to continue doing business with them should they sever relations with Masquelette and Bruhl. On May 10, 1948, R. A. Douglass, Oliver and Hughes made a written offer to purchase the respective 26.67 per cent interest held by Masquelette and Bruhl in the tangible assets of the El Paso partnership, for the aggregate sum of $19,000. In addition, an offer was made to purchase the respective interests "in the good will and intangibles of the co-partnership, aggregating 53.34 per cent, at and for a total consideration of $24,000", payable in 60 monthly installments of $400 each. The offer provided further as follows: "As part *123 of the consideration for the purchase of the good will and intangibles of the said co-partnership, it is to be expressly understood that F. G. Masquelette and E. L. Bruhl, and each of them, shall refrain from engaging in the practice of public accounting either individually or in association with others, or directly or indirectly, in any of the territory now being served by the partnership of F. G. Masquelette and Company of El Paso, for a period of five (5) years from and after the 30th day of April, 1948." By a written agreement executed as of May 1, 1948, Masquelette and Bruhl agreed to sell their respective interests in both the tangible and intangible assets of the El Paso partnership to Guy A. Douglass, R. A. Douglass, G. M. Oliver and H. E. Hughes. That agreement, which is incorporated herein by reference, provided in part as follows: "I "The accounting records of the partnership will be immediately brought up to reflect all transactions through April 30, 1948, and establish the equities of the respective partners in the tangible capital as of May 1, 1948, at book value. In this connection, revenues and expenses will be accrued on a strict accrual method, and all known *124 tangible assets and liabilities reflected therein, on the same general accounting basis as shown in the report actually prepared for the month of March, 1948, and as of March 31, 1948. Additions to Reserves for Depreciation and Bad Debts will be set up through April, 1948 in the same manner and at the same rates as through March, 1948 and no charges will be made thereto. The Parties of the Second Part shall have the right, if they so elect, to examine the underlying records located at the El Paso office, in order to satisfy themselves as to the accuracy of the statements prepared by the Parties of the First Part, such examination to be commenced, however, within ten days of the signing of this agreement by all parties hereto. "II "In full satisfaction of their combined interests in the tangible capital of the Partnership as of May 1, 1948, Parties of the Second Part agree to accept the sum of $26,689.24 (this being the book value of equity at March 31, 1948 as shown above) in cash, plus 53% of the net profit for the month of April, 1948 or less 53% of the net loss for the month of April, 1948, if there be a loss), including any adjustments as may be determined under Section I of *125 this agreement, less any amounts withdrawn in cash since that date, and Parties of the First Part agree to pay over to Parties of the Second Part the amount so determined, out of liquidation of the accounts receivable of the partnership, and/or out of cash funds of the partnership, and/or out of their own personal funds if the proceeds of the receivables and cash funds of the partnership are not sufficient, in the following manner: "Five Thousand Dollars ($5,000.00) heretofore paid by the Parties of the First Part herein to the Parties of the Second Part, the receipt of which is hereby expressly acknowledged and confessed; Five Thousand Dollars ($5,000.00) on or before June 10, 1948; Five Thousand Dollars ($5,000.00) on or before July 10, 1948; and The balance on or before August 10, 1948. "It is understood and agreed that the above installments are minimums, and that in any event, the entire first proceeds of collection of accounts receivable as of May 1, 1948 shall be applied to the retirement of the capital accounts of the Parties of the Second Part, and shall not be used for other purposes. "III "In consideration of Parties of the Second Part passing over to Parties *126 of the First Part their combined interests in such intangibles as the right to serve clients within a restricted area (as defined in a subsequent paragraph), their interests in clients' files, library, office quarters, etc. (particularly those rights reserved to F. G. Masquelette and Edwin L. Bruhl, under the provisions of Paragraph XII of the referenced partnership agreement dated October 1, 1945), but excluding the right to the use of the trade name of F. G. Masquelette & Company, or any derivative of that name, or any name including either the name of F. G. Masquelette or Edwin L. Bruhl, and with the further consideration that said F. G. Masquelette and Edwin L. Bruhl shall refrain from engaging in the practice of public accounting under terms and conditions as set out in a paragraph to follow, Parties of the First Part agree collectively and individually to pay Parties of the Second Part, the sum of Twenty-four Thousand Dollars ($24,000.00), payable in sixty (60) monthly installments of $400.00 each, the first such installment to become due and payable on the 15th day of June, 1948, and succeeding installments in like amount to become due and payable on the fifteenth day of each *127 month thereafter until the full principal sum of $24,000.00 shall have been paid. * * *
"V "In part consideration for the payment of the $24,000.00 to Parties of Second Part, by Parties of First Part (as provided in Par. 3 of this Agreement) said Parties of Second Part consisting of F. G. Masquelette and Edwin L. Bruhl, and each of them, shall refrain from engaging in the practice of Public accounting either individually, collectively, or in association with others, directly or indirectly, within the City of El Paso or its immediate trade territory (defined to include geographical area within a radius of 100 miles of El Paso). In addition, Parties of the Second Part agree neither to solicit nor to serve such clients as are presently being served by the El Paso office of F. G. Masquelette & Company outside the immediate trade territory as described. It is specifically understood, however, that the Parties of the Second Part shall have the right to enter the restricted territory, individually, collectively or in association with others, in order to serve professionally any clients whose main offices are located outside the restricted area and who are not, as of the effective *128 date of this agreement being served by F. G. Masquelette & Company of El Paso. The restrictions as to practice, however, shall automatically expire May 1, 1953; provided, however, that if the Parties of the First Part shall fail to make any of the installment payments provided for in Paragraph III of this agreement within thirty (30) days of the due date, then, and in such event, the Parties of the Second Part shall be privileged, at such Parties' option to terminate such restrictive covenant upon the giving of notice in writing to the Parties of the First Part of their desire and intention so to do, whereupon such restrictive covenant shall stand terminated and shall thereafter be of no force, effect or virtue, and the Parties of the First Part thereupon standing absolved of all liability for any further payments in respect of the consideration payable in support of such covenant, the payments theretofore made by such Parties of the First Part being retained by Parties of the Second Part; or, in such event, the Parties of the Second Part shall be privileged to continue said covenant in full force and effect and demand and receive of the Parties of the First Part performance of their *129 obligation in respect of the payment of the consideration supporting such covenant and shall be free to accelerate the maturity of the unpaid installments due thereon, rendering the same immediately due and payable, for which the Parties of the Second Part shall have their action at law. If the Parties of the Second Part, or either of them, shall violate the restrictive covenant herein imposed upon said Parties, and each of them, the Parties of the First Part may, at such Parties' option, treat such restrictive covenant as standing fully abrogated by virtue of such breach, with no further or continuing liability on the part of the Parties of the First Part for the payment of any unpaid portion of the consideration agreed to be paid in support of such restrictive covenant, or, in the alternative, the said Parties of the First Part may waive such violation and continue such restrictive covenant in full force and effect and enforce the same as against the Parties of the Second Part by appropriate judicial proceedings, including action to enjoin any violation of such covenant on the part of the Parties of the Second Part. "VI "The use of the name of F. G. Masquelette & Company or any *130 combination of names using the name Masquelette or Bruhl, by any one or more of the Parties of the First Part, individually, collectively, or in association with others, is expressly prohibited. * * *" The final partnership return filed for F. G. Masquelette & Company of El Paso contained the following: "SETTLEMENT OF PARTNERSHIP INTEREST " As of April 30, 1948, the partnership of F. G. Masquelette & Co. of El Paso was dissolved, the interests of F. G. Masquelette and E. L. Bruhl being simultaneously acquired by the four remaining partners at book value as to net assets, plus an agreed amount of $24,000.00 for Good Will. The net tangible assets were paid in cash but the payment for the Good Will is spread over a period of 60 months in monthly payments. This transaction will be reportable in the income tax returns of the individuals selling their interests as the profit is realized. The assets transferred and the liabilities assumed are as follows: "BOOK VALUES: ASSETS: Cash
$ 9,751.28
Prepaid expenses and supplies
1,180.71
Furniture and fixtures
$ 5,529.36
Less reserve for depreciation
2,237.29
3,292.07
Accounts receivable - fees
19,432.67
Less reserve for bad debts
990.29
18,442.38
Accounts receivable - miscellaneous
142.36
$32,808.80
LIABILITIES: Accounts payable
$ 965.97
Withheld tax payable
188.50
Reserves for accrued expenses
84.55
$ 1,239.02
NET TANGIBLE ASSETS
31,569.78
DEDUCT: Interests of El Paso partners: G. A. Douglass - capital
4,467.48
R. A. Douglass - capital
959.26
G. M. Oliver - capital
959.26
H. E. Hughes - capital
595.48
6,981.48
Add: Credit balance - El Paso office
1,049.02
8,030.50
23,539.28
INTERESTS OF HOUSTON PARTNERS: *
F. G. Masquelette - capital
25,102.21
E. L. Bruhl - capital
21,492.77
45,594.98
Less: Debit balance - Houston office
$20,936.45
Los Angeles account
2,119.25
$23,055.70
$23,539.28"
*131 During 1948 Masquelette and Bruhl each received payments totalling $1,400 from the purchasers, in part payment of the total $12,000 due each of them from the sale of the intangible assets. Masquelette and Bruhl each reported the sum of $1,400 as capital gain. Respondent determined that the payments received in 1948 were in consideration of the covenant not to compete and were taxable as ordinary income. On the joint income tax return for 1948 filed for F. G. Masquelette, deceased, and Sarah Olive Masquelette, his wife, the sum of $12,085.91 was reported as ordinary income from the El Paso partnership. On the joint income tax return for 1948 of Edwin L. Bruhl and Lillian Marie Bruhl the sum of $12,085.90 was reported as ordinary income from the El Paso partnership. The amount of $1,400 received by each of the petitioners in 1948 was consideration paid for the transfer of the intangible assets, including the covenant not to compete, and constitutes ordinary income to petitioners. No part of the income of the El Paso partnership for the taxable year 1948 was gain realized from the sale of a capital asset. Opinion LeMIRE, Judge: *132 The first question presented is whether the proceeds received by the petitioners during the taxable year 1948 upon the sale of their respective interests in an accounting partnership, together with a covenant not to compete, are taxable as ordinary income or as capital gain. The petitioners contend that the consideration received from the sale of the partnership intangible assets is taxable as a capital transaction because the proceeds represented a sale of the going business, including good will, and that the covenant not to compete was incidental and inseparable from the sale of the good will. Respondent contends that the consideration received is taxable as ordinary income because the petitioners retained the good will of the firm and that the principal item sold by them was the covenant not to compete which was severable from the good will. The record shows that petitioners were nonresident members of F. G. Masquelette & Company of El Paso, an accounting copartnership. In May 1948 an agreement was entered into whereby the petitioners agreed to sell their respective interests to the resident partners. Although the partnership was on the cash basis of accounting, the unbilled and *133 uncollected fees were accrued and the capital accounts were adjusted accordingly as of May 1, 1948. During 1948 petitioners received payment of their capital accounts representing accrued distributable income and the book value of the assets. In addition, petitioners sold certain intangible assets, reserved the use of the name of "F. G. Masquelette & Company," and agreed not to compete in the El Paso area for a period of five years. The so-called "intangible assets" were specified in the agreement as consisting of the files pertaining to clients, library, stationery, office furniture and equipment, the office lease, and "the right to serve clients within a limited area." The agreement does not mention good will. It is well established that good will is a capital asset and any gains resulting from the sale thereof are capital gains. Aaron Michaels, 12 T.C. 17, acq., C.B. 1949-1, 3. However, we do not agree with petitioners that good will was a part of the assets transferred to the resident partners. Aside from the fact that the May 1948 agreement omitted any reference to good will, we think it clear that the consideration paid for the intangible assets was for certain *134 enumerated physical assets pertaining to the office, the lease thereon, and an amount to compensate petitioners for refraining from entering into accounting activities in the El Paso area for a period of 5 years. The record shows that the firm of F. G. Masquelette & Company had operated in El Paso for many years and that much of the business of that office resulted from the reputation of Masquelette for accurate and capable work as an accountant. A large part of the going business value of the partnership attached to the good will that the name of "F. G. Masquelette & Company" bore. That name was specifically retained by petitioners. At the same time petitioners agreed not to compete with the resident partners to whom they sold their interests. We hold that such covenant was an item separate from the good will attaching to the partnership name of F. G. Masquelette & Company. Accordingly, such amount as was paid for the covenant is ordinary income and not income from the sale of a capital asset. Estate of Mildred K. Hyde, 42 B.T.A. 738. The cases of Toledo Newspaper Co., 2 T.C. 794, Toledo Blade Co., 11 T.C. 1079, affd. per curiam, 180 Fed. (2d) 357, *135 and Ethyl M. Cox, 17 T.C. 1287, relied upon by petitioners, are distinguishable in that in those cases the particular covenant not to compete was nonseverable and had only the function of assuring the purchasers the beneficial enjoyment of the good will which was transferred. The case of Rodney B. Horton, 13 T.C. 143, n. acq., C.B. 1949-2, 4, appeal dismissed, 180 Fed. (2d) 354, is likewise inapplicable since we held there that the selling partner transferred the good will along with the partnership name in the sale and dissolution of his accounting practice. Respondent determined in the deficiency notices that the entire consideration received by the petitioners over the book value of their interest in the partnership of F. G. Masquelette & Company was ordinary income to petitioners. Since, in our opinion, no element of good will was transferred by petitioners, the covenant not to compete was a separate and distinct item from the good will which was retained. Hence, all of the proceeds received for the so-called intangible assets constitute ordinary income to the petitioners. On this issue the respondent's determination must be sustained. *136 The second question presented is whether the petitioners erred in reporting in 1948 all of the income of the El Paso partnership including fees earned but uncollected as of May 1, 1948, the date of the transfer of their respective interests. The petitioners now claim that 26 2/3 per cent of the partnership's net uncollected fees of $18,422.38 ($19,432.67 less $990.29) should have been returned by petitioners as capital gain. The record shows that the agreement of May 1, 1948, provided that in order to establish the equities of the respective partners in the tangible capital and undistributed profits, all revenues and expenses, assets and liabilities were to be accrued as of May 1, 1948, and allocated to the capital accounts. The amounts accruing to the selling partners were to be paid in full by August 10, 1948. The partnership, which was on the cash basis, filed its final return for the fiscal year ended September 30, 1948, and reported the sum of $19,432.67 as uncollected fees. This amount, less a provision for bad debts of $990.29, was included in the partnership net income. The joint income return for 1948 filed by the Masquelettes reported the amount $12,085.91 and the joint *137 income return for 1948 filed by the Bruhls reported the amount $12,085.90 as ordinary income from the El Paso partnership. It is clear that the proceeds in question represented compensation to petitioners for what would have been their distributive share of the partnership earnings as of May 1, 1948. On that date the partnership was dissolved and since the books and records were kept on the cash basis and the fees had not been collected, it was agreed that the petitioners would receive their distributive share of partnership income from the purchasing partners in an amount equivalent to the agreed value of the fees worked out on a strict accrual basis. As to these proceeds there was no sale of a partnership interest which is entitled to be treated as the sale of a capital asset. G.C.M. 26379, C.B. 1950-1, 58; Helvering v. Smith, 90 Fed. (2d) 590. Petitioners merely received in advance proceeds which would have been ordinary income of the partnership. Doyle v. Commissioner, 102 Fed. (2d) 86. We think the instant proceeding is controlled by the rule of law as stated by this Court in George F. Johnson, 21 T.C. 733, 738, as follows: *138 "It is by now well settled that a withdrawing partner is chargeable with ordinary income on his share of the partnership profits, whether currently distributed or not, up to the time of his withdrawal. * * * This is so notwithstanding that he sells his interest to the continuing partner." [Italics supplied.] We are not unmindful that in the above case and in Louis Karsch, 8 T.C. 1327, cited therein, the partnership was on the accrual method of accounting. Regardless of the method of accounting, the transfer of earned ordinary partnership income is, in our opinion, no different in principle than an anticipatory assignment of income. See Helvering v. Horst, 311 U.S. 112; and Helvering v. Eubank, 311 U.S. 122. Hence, the sale or assignment of a partnership interest which is a capital asset does not transmute the right to ordinary income produced by that interest into a capital item. United States v. Snow, 223 Fed. (2d) 103 (C.A. 9, May 3, 1955), and cases cited therein. Petitioners rely heavily upon Swiren v. Commissioner, 183 Fed. (2d) 656, certiorari denied 340 U.S. 912, reversing a Memorandum Opinion *139 of this Court filed October 11, 1949 [8 TCM 924,]. We think that the Snow case, supra, fully supports the rationale applied by this Court in cases similar to the situation involved here. We hold that the petitioners properly reported all of their distributive shares of the income of the El Paso partnership including fees earned but uncollected as of May 1, 1948. Decisions will be entered for the respondent. Footnotes
*. Settled and to be settled in cash.↩