Estate of Leo Melnik, Deceased, Samuel Goldenberg, Executor v. Commissioner. Max B. Karan and Rita Karan v. Commissioner.
Estate of Melnik v. Commissioner
Docket Nos. 85666, 93016.
United States Tax Court
T.C. Memo 1962-129; 1962 Tax Ct. Memo LEXIS 180; 21 T.C.M. (CCH) 671; T.C.M. (RIA) 62129; May 29, 1962
Samuel Goldenberg, *181 Esq. and J. Curtis McKay, Esq., 735 N. Water St., Milwaukee, Wis., for the petitioner in Docket No. 85666. Joseph I. Swietlik, Esq. and George J. Laikin, Esq., for the petitioners in Docket No. 93016. William J. Wise, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax and additions to tax as follows: Addition to tax
under Sec.
294(d)(2)
Docket
Income Tax
I.R.C.
No.
Petitioner
Year
Deficiency
of 1939
85666
Estate of Leo Melnik, Deceased, Samuel
Goldenberg, Executor
1956
$1,942.14
1957
3,311.08
93016
Max B. Karan and Rita Karan
1954
1,562.46
$140.10
1955
3,761.83
1956
3,556.50
1957
3,159.24 The issue in these consolidated cases is whether certain payments received by Leo Melnik on liquidating his interest in an accounting partnership with Max B. Karan are taxable to Melnik as capital gains and nondeductible by Karan. Findings of Fact Leo Melnik was a resident of Milwaukee, Wisconsin, during the years here involved. He filed his income tax returns for the *182 years 1956 and 1957 with the district director of internal revenue at Milwaukee, Wisconsin. Leo Melnik died on March 8, 1959. Max B. and Rita Karan, husband and wife, are residents of Milwaukee, Wisconsin. They filed joint income tax returns for the years 1954 through 1957 with the district director of internal revenue at Milwaukee, Wisconsin. In 1932 Leo Melnik and Max Karan, both of them certified public accountants, agreed verbally to form a partnership for the practice of accounting, with the work and the income to be divided equally. At the time the partnership was formed each partner had personal accounts which were not transferred to the partnership. Under the verbal partnership agreement there was no provision made for terminating the partnership or for the treatment of good will upon termination. In addition to his accounting practice Melnik was also active in trading on the stock market. A substantial portion of the 88 accounts being serviced by the partnership in 1954 was originally acquired through the efforts of Karan. Some of the accounts were principally serviced by Melnik and Karan individually, with Karan servicing many more accounts than Melnik. Some of the *183 accounts were serviced by Melnik or Karan with the assistance of a senior accountant. From 1947 to 1952 the partnership employed two accounting assistants, and from 1952 through 1954 there was only one accounting assistant, who, together with either Melnik or Karan, worked on about one-half of the firm's accounts. In 1951 the partners discussed the termination of the partnership but were unable to agree on terms and conditions. On May 5, 1954 the partners executed an agreement in the form of a letter offered by Melnik and an acceptance by Karan. This agreement provided, in part, as follows: For and in consideration of the sum of $30,000.00 paid to me [Melnik] as evidenced by a certain promissory note, which you [Karan] have this day executed to me [Melnik] and which has been endorsed by Samuel Sampson, I [Melnik] agree with you as follows: 1. I [Melnik] hereby, assign, transfer and set over unto you as the remaining partner of the firm of Melnik & Karan, Certified Public Accountants, my interest in said partnership of Melnik & Karan, as the same shall appear on July 1, 1954, as shown in Exhibit "A" hereto attached, except that I shall receive one-half of the office *184 furniture and equipment presently belonging to the firm of Melnik & Karan. 2. As of July 1, 1954, you [Karan] will discontinue the use of the name of Melnik & Karan as a firm name and shall have the right to continue servicing the Accounting Clients of Melnik & Karan as per list attached hereto and marked Exhibit "A", either by yourself or in conjunction with any party of your choosing. 3. I [Melnik] may engage, either alone or in conjunction with others, in the practice of Accounting and Income Tax work after July 1, 1954, in my own name, but I shall not use the name of Melnik & Karan. Provided, however, that I agree not to solicit or accept employment from any of the named clients of Melnik & Karan mentioned in the list attached hereto, which list is marked Exhibit "A", for a period of three (3) years and four (4) months from July 1, 1954. 4. The payment to me [Melnik] of the sum of $30,000.00, which is evidenced by a certain promissory note this day executed to me by you and endorsed by Samuel Sampson guaranteeing payment, does not include my one-half share of fees due the firm of Melnik & Karan as of this date and fees that will be earned for work commenced prior to *185 July 1, 1954, but which may not be completed on that day. 5. When such fees, referred to in Paragraph 4, are collected, I [Melnik] shall be entitled to one-half (1/2) of such fees so collected. All fees received by the firm of Melnik & Karan, or its successors after July 1, 1954, from clients listed in Exhibit "A", shall first be applied on amounts due for work commenced prior to July 1, 1954, and completed later, and deposited in the American State Bank partnership account of Melnik & Karan, and distributed immediately, equally. 6. This agreement applies only to the partnership accounts of Melnik & Karan, a list of which is hereto attached and which has been identified as Exhibit "A" and incorporated herein by reference as though fully set out herein, and does not apply to the individual or sole clients of either you [Karan] or myself [Melnik]. 7. All books and records of the partnership shall be made available to me [Melnik] at all times. 8. I [Melnik] shall have the right to enforce payment of any outstanding accounts of the partnership of Melnik & Karan if not paid by July 1, 1955. 9. On July 1, 1954, the partnership of Melnik & Karan will attach a list hereto *186 giving the name and address and the amount due to said partnership of accounts receivable and also a list of all work in process by the partnership. The partnership of Melnik & Karan will pay for any labor, traveling or other direct expenses on work that has to be completed after July 1, 1954, and I [Melnik] shall share equally in the fee charged to clients for this work. 10. In the servicing of the clients of the present partnership Melnik & Karan after July 1, 1954, and for a period of three years (3) and four months (4) thereafter, you [Karan] agree as follows: (a) To open a new bank account in your own name, or in the name of any person of your choosing, in any bank of your choice, as a depositary for fees received on any new work in servicing the list of the clients of Melink [Melnik] & Karan after July 1, 1954, such bank account to be subject to the withdrawal of your signature or any signature you may designate. (b) To maintain the present partnership account of Melnik & Karan in the American State Bank as a depositary for fees for services started by the firm of Melnik & Karan to clients of the firm prior to July 1, 1954, until completion of work and collection *187 of all accounts in full. (c) To save me [Melnik] free and harmless from any and all obligations of any kind, nature or description of the firm of Melnik & Karan after July 1, 1954. (d) To be solely responsible and liable for any and all liabilities and/or obligations incurred by you [Karan] in the servicing of the clients of Melnik & Karan as an accountant and tax consultant after July 1, 1954. * * *
The exhibit attached to the agreement listed 88 accounts which were then being served by the partnership. Personal accounts of Melnik and Karan were not involved in the agreement. Subsequently in 1954 one of the 88 accounts, General Merchandise Company, refused to be serviced by Karan, and the account was sold by Karan to Melnik for $750. On May 5, 1954 Karan executed a note to Melnik for $30,000, with interest at 6 percent, payable in installments of $750 a month beginning on August 1, 1954 and ending on November 1, 1957. The note was guaranteed by one Samuel Sampson. The consideration of $30,000 under the May 5, 1954 agreement was based upon an approximation of 70 percent of the average annual fees earned by the partnership. The consideration for the transfer of the *188 General Merchandise account by Karan to Melnik was based approximately on the same formula. After July 1, 1954 the collections from the outstanding receivables, which continued for a period of about two years, were deposited in a bank account maintained in the partnership name and then paid out in equal shares to Melnik and Karan. In 1955 a legal fee was paid by the partnership to enforce collection of a receivable. Partnership returns of income signed by Melnik were filed for the years 1955 and 1956. By October 31, 1957, 23 out of the 88 accounts covered by the May 5, 1954 agreement had ceased to be clients, and by the time of the trial an additional 10 ceased to be clients. Melnik (Docket No. 85666) reported the amounts of $9,000 and $8,250 in 1956 and 1957 as long-term gains from the sale of a partnership interest. Respondent determined that these amounts were taxable as ordinary income. Karan (Docket No. 93016) claimed deductions of $3,750, $9,000, $9,000 and $7,500 in his returns for the years 1954 through 1957, respectively, for the payments made by him to Melnik in those years. [1] Respondent disallowed these deductions in full. *189 Opinion The basic issue is whether Karan agreed in 1954 to pay $30,000 in installments to Melnik for Melnik's interest in the partnership good will or whether this sum was paid for something else. Respondent's position is that the payments over the years 1954, 1955, 1956 and 1957 to Melnik were for his interest in the partnership good will, and that such payments are taxable to Melnik as capital gains and are not deductible by Karan. In an earlier opinion of this Court involving the tax treatment of the installments received by Melnik in 1954 and 1955, we held that Melnik sold his interest in partnership good will to Karan and that the proceeds were taxable to Melnik as capital gains. [2] The present case involves the installments received by Melnik in 1956 and 1957, and it involves the tax treatment of the payments made by Karan in 1954, 1955, 1956 and 1957. *190 Karan argues that starting in 1950 his relationship with Melnik in their accounting practice began to deteriorate; that Melnik, while receiving half the profits, devoted more and more time to his personal stock transactions and less time to the accounting practice; that Melnik was belligerent toward the partnership employees; that he, Karan, made the payments to Melnik in order to extricate himself from a partnership agreement that had become "personally and financially onerous to Karan"; and that payments made to relieve a person from an onerous business contract are deductible as ordinary and necessary business expenses. We may assume that personal differences were a strong motive for Karan's decision in 1954 to terminate his partnership relation with Melnik. But whatever the motives were, the inescapable fact is that under the May 5, 1954 agreement Karan, in an arm's-length transaction, purchased Melnik's interest in the partnership good will, a valuable capital asset which Karan thought was worth at least $30,000. This interest in the partnership good will, as represented by the list of 88 clients which the partnership acquired after more than 20 years, continued to be valuable *191 to Karan in his accounting practice in subsequent years, and it is difficult to understand how Karan can argue that he is entitled to an expense deduction for the payments made by him to acquire this valuable capital asset. The cases cited by Karan for this proposition are inapplicable here since in all of them the taxpayer made the expenditure for the sole purpose of escaping a burdensome contract or to meet some business obligation and not, as here, to acquire an asset of continuing value to the purchaser. See, e.g., Helvering v. Community Bond & Mortgage Corporation, 74 F. 2d 727; Pressed Steel Car Co., 20 T.C. 198. If, as Karan argues, it was his wish to escape an "onerous" partnership relationship with Melnik, the way was open under the Wisconsin statutes to seek dissolution of the partnership with equitable distribution of assets. Sections 123.26 et seq., Wisconsin Statutes Annotated. Karan did not choose this route but, instead, decided to continue the accounting practice without the participation of Melnik and to do this Karan apparently thought it was necessary to buy Melnik's interest in the partnership good will as represented by the customer *192 list and to pay $30,000 for it. It is this transaction, as voluntarily entered into by the parties, which must determine the tax consequences. Karan's next argument is that no good will existed. Good will has been defined as "nothing more than the probability that the old customers will resort to the old place." See Merle P. Brooks, 36 T.C. 1128, 1133. Over a period of more than 20 years the partnership had built up a practice of 88 clients and it was this clientele that Karan was anxious to retain in 1954. It is clear that good will did exist in the partnership, as represented by the list of clients, and that Karan was willing to pay a substantial consideration for Melnik's interest in such partnership good will. Karan lists several factors in his brief to show that good will did not exist. Many of these factors, however, do not pertain to the question of whether good will exists, but whether vendible good will exists. Karan makes no effort to differentiate these two aspects of the problem. In any event, they do not help Karan. Good will can be transferred without the use of the firm name. Estate of Masquelette v. Commissioner, 239 F. 2d 322; Rev. Rul. 60-301, 1960-2 C.B. 16. *193 It is immaterial that none of the 88 clients had contracts with the partnership and that in the ensuing years some of these clients were lost. Good will, by its very nature, does not depend upon contractual control over customers but merely on the probability or expectancy that they will continue to come to the old place without such compulsion. Finally, there is nothing in the record to indicate that the good will of this partnership somehow depended on the personal qualifications of Karan, and certainly this is not shown by the fact that Karan developed and serviced more of the partnership clients than Melnik did. An issue is raised in the respondent's pleading and argument made in the briefs that section 736 of the Internal Revenue Code of 1954[3] applies here, and that the payments were guaranteed payments under section 736(a). *194 We do not believe section 736 is applicable. The respondent's regulations provide that "Section 736 and this section apply only to payments made by the partnership and not to transactions between the partners. Thus, a sale by partner A to partner B of his entire one-fourth interest in partnership ABCD would not come within the scope of section 736." Income Tax Regs., sec. 1.736-1(a)(1)(i). We believe the regulation correctly interprets the scope of this section and although the illustration in the regulation uses a four-man partnership to show the type of transaction excluded from section 736, we think that if the sale of an interest took place in a two-man partnership, such sale would similarly be excluded. The payments under the May 5, 1954 agreement to Melnik were made by Karan, not by the partnership, and in fact the payment of this sum was evidenced by a promissory note executed by Karan and guaranteed by one Samuel Sampson. The transaction was between the individuals. We believe that under these facts section 736 does not apply here. We hold that under the May 4, 1954 agreement Melnik sold to Karan his, Melnik's, interest in partnership property, *195 i.e., good will, and that the payments received by Melnik are taxable as proceeds from the sale of a capital asset. Such payments made by Karan to Melnik for the acquisition of the partnership capital asset, good will, are not deductible by him in any of the years here involved. Karan makes some argument on brief that the respondent is prevented from taking inconsistent positions on the same issue. Respondent, in order to protect the revenue, may take inconsistent positions on the tax consequence of a transaction that touches more than one party. Here he has done so with respect to the deficiencies determined but not in his argument. In the prior Tax Court case it was held that the May 1954 transaction represented the sale of a capital asset (good will) by Melnik to Karan. In the present cases, respondent accepts this interpretation of the transaction and on brief argues that the payments received by Melnik for the years in question are taxable as capital gains, and the same payments are not deductible by Karan. There is no inconsistency in these positions. Moreover, since the correct interpretation of the May 1954 agreement would determine the rights of both Melnik and Karan, being *196 but different sides of the same coin, it was appropriate to consolidate these cases for trial, notwithstanding the objections voiced by the parties. See Seligmann v. Commissioner, 207 F. 2d 489. Decision will be entered for the petitioner in Docket No. 85666. Decision will be entered for the respondent in Docket No. 93016. Footnotes
1. There is no explanation in the record with respect to Melnik reporting receipt in 1957 of $8,250 and Karan reporting payment that year in the sum of $7,500.↩
2. In Estate of Leo Melnik, T.C. Memorandum 1961-18 (filed January 27, 1961), this Court found that the effect of the agreement of May 5, 1954 was the sale by Melnik to Karan of Melnik's interest in the good will of the partnership as of July 1, 1954, and held that the amounts of $3,750 and $8,250 received by Melnik from Karan under that agreement in the years 1954 and 1955 were taxable as long-term capital gains.↩
3. All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise specified. SEC. 736. PAYMENTS TO A RETIRING PARTNER OR A DECEASED PARTNER'S SUCCESSOR IN INTEREST. (a) Payments Considered as Distributive Share or Guaranteed Payment. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, except as provided in subsection (b), be considered - (1) as a distributive share to the recipient of partnership income if the amount thereof is determined with regard to the income of the partnership, or (2) as a guaranteed payment described in section 707(c) if the amount thereof is determined without regard to the income of the partnership. (b) Payments for Interest in Partnership. - (1) General Rule. - Payments made in liquidation of the interest of a retiring partner or a deceased partner shall, to the extent such payments (other than payments described in paragraph (2)) are determined, under regulations prescribed by the Secretary or his delegate, to be made in exchange for the interest of such partner in partnership property, be considered as a distribution by the partnership and not as a distributive share or guaranteed payment under subsection (a). (2) Special Rules. - For purposes of this subsection, payments in exchange for an interest in partnership property shall not include amounts paid for - (A) unrealized receivables of the partnership (as defined in section 751(c)), or (B) good will of the partnership, except to the extent that the partnership agreement provides for a payment with respect to good will.↩