ESTATE of F. G. MASQUELETTE, Deceased, Houston Bank and Trust Company, Executor, and Sarah Olive Masquelette, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Edwin L. BRUHL and Lillian Marie Bruhl, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.
No. 15917.

United States Court of Appeals
Fifth Circuit.
Dec. 26, 1956.

Aaron Goldfarb, Houston, Tex., for petitioners.

Carolyn R. Just, Atty., Tax Division, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, John Potts Barnes, Chief Counsel, Int. Rev. Service, John M. Morawski, Sp. Atty., Int. Rev. Service, Louis Foster, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

These petitions for review of a decision of the Tax Court present the single question whether the proceeds of a sale of petitioners' interest in an accounting partnership were received in payment for the sale of a capital asset or as ordinary income, the answer to that question being found by a determination whether the sale included the good will of the firm or was primarily compensation paid for an agreement not to compete.

A second question, originally raised by petitioners, whether payment to them of their share of earned but uncollected fees by the purchasers was to be treated as ordinary income has been abandoned by petitioners, and as to it the order of the Tax Court is affirmed.

The principal parts of the record were either stipulated or were without dispute. In essence, the case made out by the taxpayers was as follows:

F. G. Masquelette had been a successful accountant in Houston, Texas, since 1909, and in El Paso since 1912. In 1934 E. L. Bruhl became a partner in the El Paso office and in 1939 a partner in the Houston office, these being two separate partnerships. They were also partners with others in Albuquerque, New Mexico, for the years 1943–1948. During the years 1946, 1947, and early 1948, Bruhl spent approximately 90 percent of his time in Houston and the remaining 10 percent in the other two offices. Masquelette visited El Paso once a year on his way to California. In early 1948, as a result of circumstances arising in the Albuquerque office, both Masquelette and Bruhl resolved to maintain more adequate review and control over that office, as well as the one in El Paso. After making a trip to visit the El Paso office Bruhl learned that the local partners there were dissatisfied with having their work supervised by nonresident associates and were planning to leave Masquelette & Company of El Paso and to form a new accounting firm. Bruhl also learned that unless he could personally move back to El Paso and devote most of his time to that office it would thereafter

be impossible to maintain a profitable accounting practice in El Paso in competition with Douglass, Oliver, and Hughes, the other El Paso partners, since substantially all of Masquelette's El Paso clients indicated an intention to continue doing business with them should they sever relations with Masquelette and Bruhl.

By a written agreement executed as of May 1, 1948, Masquelette and Bruhl agreed to sell their respective interests in both the tangible and intangible assets of the El Paso partnership to Guy A. Douglass, R. A. Douglass, G. M. Oliver, and H. E. Hughes. That agreement provided in part as follows:

I.

"The accounting records of the partnership will be immediately brought up to reflect all transactions through April 30, 1948, and establish the equities of the respective partners in the tangible capital as of May 1, 1948, at book value. In this connection, revenues and expenses will be accrued on a strict accrual method, and all known tangible assets and liabilities reflected therein, on the same general accounting basis as shown in the report actually prepared for the month of March, 1948, and as of March 31, 1948. Additions to Reserves for Depreciation and Bad Debts will be set up through April, 1948 in the same manner and at the same rates as through March, 1948 and no charges will be made thereto * * *.

II.

"In full satisfaction of their combined interests in the tangible capital of the Partnership as of May 1, 1948, Parties of the Second Part agree to accept the sum of $26,689.-24 (this being the book value of equity at March 31, 1948 as shown above) in cash, plus 53% of the net profit for the month of April, 1948 (or less 53% of the net loss for the month of April, 1948, if there be a loss), including any adjustments as

may be determined under Section I of this agreement, less any amounts withdrawn in cash since that date, and Parties of the First Part agree to pay over to Parties of the Second Part the amount so determined, out of liquidation of the accounts receivable of the partnership, and/or out of cash funds of the partnership, and/or out of their own personal funds if the proceeds of the receivables and cash funds of the partnership are not sufficient, in the following manner: * * *.

### III.

"In consideration of Parties of the Second Part passing over to Parties of the First Part their combined interests in such intangibles as .the right to serve clients within a restricted area (as defined in a subsequent paragraph), their interests in clients' files, library, office quarters, etc. (particularly those rights reserved to F. G. Masquelette and Edwin L. Bruhl, under the provisions of Paragraph XII of the referenced partnership agreement dated October 1, 1945), but excluding the right to the use of the trade name of F. G. Masquelette & Company, or any derivative of that name, or any name including either the name of F. G. Masquelette or Edwin L. Bruhl, and with the further consideration that said F. G. Masquelette and Edwin L. Bruhl shall refrain from engaging in the practice of public accounting under the terms and conditions as set out in a paragraph to follow, Parties of the First Part agree collectively and individually to pay Parties of the Second Part, the sum of Twenty-four Thousand Dollars ($24,000.00), payable in sixty (60) monthly installments of $400.00 each, the first such installment to become due and payable on the 15th day of June, 1948, and succeeding installments in like amount to become due and payable on the fifteenth day of each month thereafter until the full principal sum of $24,000.00 shall have been paid.

* * * * * *

### V.

"In part consideration for the payment of the $24,000.00 to Parties of Second Part, by Parties of First Part (as provided in Par. 3 of this Agreement) said Parties of Second Part consisting of F. G. Masquelette and Edwin L. Bruhl, and each of them, shall refrain from engaging in the practice of Public accounting either individually, collectively, or in association with others, directly or indirectly, within the City of El Paso or its immediate' trade territory (defined to include geographical area within a radius of 100 miles of El Paso). In addition, Parties of the Second Part agree neither to solicit nor to serve such clients as are presently being served by the El Paso office of F. G. Masquelette & Company outside the immediate trade territory as described. It is specifically understood, however, that the Parties of the Second Part shall have the right to enter the restricted territory, individually, collectively or in association with others, in order to serve professionally any clients whose main offices are located outside the restricted area and who are not, as of the effective date of this agreement being served by F. G. Masquelette & Company of El Paso * * *.

### VI.

"The use of the name of F. G. Masquelette & Company or any combination of names using the name Masquelette or Bruhl, by any one or more of the Parties of the First Part, individually, collectively, or in association with others, is expressly prohibited * * *."

The reference in this contract to "those rights reserved to F. G. Masquelette and Edwin L. Bruhl under the provisions of Paragraph XII of the referenced partnership agreement dated October 1, 1945," makes clear that "such intangibles" included "the right and title to the possession and use of the office

quarters being occupied by the terminated partnership * * * to all the files, correspondence, working papers, copies of tax returns and copies of reports, which have been accumulated in the operation of the office, and any leases in connection with such property."

During 1948 Masquelette and Bruhl each received payments totaling $1,400 from the purchasers in part payment of the total $12,000 due each of them under their agreement to sell what they referred to as "intangible assets." The Commissioner treated these payments as being received as consideration for the covenant not to compete and so determined that they were taxable as ordinary income. The Tax Court approved his determination.

The first part of the agreement executed as of May 1, 1948, deals with the sale of the interest of Masquelette and Bruhl in the "tangible capital" of the partnership known as F. G. Masquelette & Company of El Paso and is not involved here. Thus we are now concerned only with the second portion of that agreement which is covered principally by paragraphs III, V, and VI, and which is referred to by taxpayers as an agreement for the sale of "intangible assets." The question is whether the installments paid in 1948 as part of the consideration due under this second portion of the agreement should be taxed as capital gain under 1939 Internal Revenue Code Section 117, or as ordinary income under Code Section 22, 26 U.S.C.A. § 117 and § 22. The taxpayers contend that such payments were proceeds from a sale of a going business, including good will, and that the covenant not to compete was incidental and inseparable from the sale of good will. On the other hand, the Commissioner takes the position that good will was not included in the sale or that the payment covered by this portion of the agreement was for the covenant not to compete, which was severable from any good will the partnership had. The Tax Court agreed with the Commissioner and held that the entire payments were taxable as ordinary income.

The parties in their briefs concede that if the payments were made for good will they represented capital gains, whereas if they were for a covenant not to compete they must be taxed as ordinary income.

Respondent here contends (1) that there is here no sale of the good will at all, primarily because of the denial to the purchasers of the right to use Masquelette's name; (2) that even if a sale of good will was effected by the contract of sale, there was also a separable sale of freedom from competition and the burden was on the taxpayer to prove what part of the purchase price was attributable to good will as distinguished from the agreement not to compete, in default of which the Tax Court could not attribute any part of the payments to the other intangibles.

We think we need not come to the second phase of the matter because we conclude that the stipulations, written contract, and undisputed evidence require a decision that petitioners sold their good will and that this was partially effectuated by their agreement not to compete. The Toledo Newspaper Co. v. C. I. R., 2 T.C. 794; Toledo Blade Co. v. C. I. R., 11 T.C. 1079, affirmed 6 Cir., 180 F.2d 357; Michaels, 12 T.C. 17, acq., C.B. 1949–1, 3.

■■ The Tax Court here laid stress on the fact that the words "good will" were not included in the sale of intangible assets. The use of these words is, of course, not necessary if in fact what is transferred does give to the purchaser everything that can effectively aid him to step into the shoes of the seller. See Cox v. C. I. R., 17 T.C. 1287. Possibly the best known definition of good will is that of Justice Story:

"Good will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it re-

ceives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." Story, Partnerships, § 99.

It is quite significant that the respondent makes no attack on the principle announced in the Toledo Newspaper Company decision, supra, though in the sale of good will in that case the term "good will" was not used. This may well have been because what was being sold there did not include the plant or physical assets of the seller and the agreement not to compete was only for a limited time; thus it may have been a sale of limited good will or of a part of the good will of the seller, because the seller would have the right after the end of the period to re-enter the field and compete. There is thus no indication that a sale of good will must be considered as something other than a capital asset where not all of it is sold.

The Tax Court also stressed the fact that the petitioners provided in their contract of sale that the purchasers should not use the name Masquelette in connection with their accounting practice. This again is not a controlling fact. This was the personal name of one of petitioners and it requires no record evidence to enable a court to understand that a professional man would not want his name to be associated with the work of others over whom he had no control. Here the record makes it clear that this was the motivating reason for the action taken. It may be conceded that some additional value might have accrued to the El Paso partners if Masquelette had permitted them to continue to use his name, although the testimony was that they were dissatisfied because their names were not in the firm name. Possibly they would have paid somewhat more if the name had gone with the other intangibles. But does that change the effect of the undoubted conveyance of every right, tangible and intangible, to the purchasers to succeed to the professional practice of the seller? We think not. The withholding of the right to use the name was of no intrinsic value to the sellers since they could not use it in the El Paso area either. It may also be noted that in the Toledo Newspaper Company case the sellers of what was admittedly good will specifically excluded the "name and/or emblem of Scripps-Howard," this being a name owned by a corporation which owned a majority of the Class A stock of the Toledo Newspaper Company and which itself agreed not to compete as an inducement to the purchaser. This has not caused the Government to question the correctness of the ruling of the Tax Court in the Toledo case.

■ Finally, it seems to be conceded by the Government, as indeed it must, under the authorities, that if the agreement not to compete is a non-severable part of the conveyance of good will, then the entire purchase price is to be treated as having been paid for good will. This is precisely what the Tax Court held in Toledo Newspaper Co. v. C. I. R., supra, and it is the effect of the subsequent holding of the Tax Court in Toledo Blade Co. v. C. I. R., supra.

We think it clear that the agreement not to compete here was one of the means used by petitioners to assure the purchasers that the entire good will of the petitioners in El Paso would be effectively conveyed to their successors who would thereafter occupy the same offices, have all the files and work papers and audits of their clients, together with the lease and the working tools not valued as tangibles, such as tax services systems and the like used in their practice.

There is nothing here inconsistent with the appellate court cases cited on behalf of the respondent. In Beals' Estate v. C. I. R., 2 Cir., 82 F.2d 268, there was a sale of the assets of a corporation, including the good will, and this was recognized by all to be a sale of good will; then there was a separate agreement by the taxpayers who were stockholders of the corporation, that they would not compete and a separate consideration was

paid them for that. Such agreement was *all they* sold. They owned none of the good will of the corporation. The court there rightly considered that the payment they received for their agreement was for that alone and not for a sale of good will.

So, too, in C. I. R. v. Gazette Tel. Co., 10 Cir., 209 F.2d 926, an agreement was made for the purchase of stock in a newspaper publishing company. By acquiring the stock the purchasers would, of course, acquire all of the good will as well as all the other assets of the corporation. They also, however, exacted an agreement from the stockholders that they would not engage in the newspaper business for a restricted time in a certain area. Separate valuations were placed by the parties on the value of the stock and the value of the agreement, although a single payment was made for both. The court held the part received for the agreement not to compete was separable.

Salvage v. C. I. R., 2 Cir., 76 F.2d 112, dealt with a situation in which a corporation sold to its officer, the taxpayer, its own stock at less than its actual value in return for his agreement not to engage in a competitive business. Of course, in that case there was no sale of good will involved and it is therefore no authority for the respondent's contention here.

As to the Tax Court cases cited by the respondents, we think they are even less apposite here than those we have referred to above. We conclude that the payments made under the provisions of paragraphs III, IV, V, and VI of the contract were made to purchase the good will of the taxpayers and may thus be treated by them as for a sale of a capital asset. We do not deem this a reversal of the Tax Court on an issue of fact, but rather a conclusion based on an interpretation of the written contract in the light of undisputed oral testimony. Our power to review in such a case is as in Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.

Reversed and remanded for further proceedings not inconsistent with this opinion.