Emmette L. BARRAN and Martha Barran et al., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 20599.

United States Court of Appeals Fifth Circuit.

July 9, 1964.

White Way Pure Milk Company at Decatur, Alabama. For the year 1957 each partner filed a joint income tax return with his wife. This suit involves a dispute over the proper treatment of certain gains arising in connection with the sale of White Way in that year.

At the time of the sale the partnership was operating a milk plant in Decatur and selling the processed milk to retail and wholesale customers in thirteen northern Alabama counties. In addition to the plant, inventory, and equipment, the partnership owned a plot of land, on which the plant was located, fronting 600 feet on U. S. Highway 31, and another adjacent lot with a 200 foot frontage.

On October 30, 1957, the partners met with representatives of Pet Dairy Products Company, a Delaware corporation with principal offices in Johnson City, Tennessee, and the partnership agreed to sell White Way's land, plant, equipment, licenses, permits, and accounts receivable for $550,000, with adjustments to be made for the actual value of the accounts receivable. The memorandum agreement signed by the partners recites that "The Partnership will sell * * * the following assets * *. *." Included in the memorandum was a provision that the individual parties and Pet would enter into a "non-competitive agreement" under which Pet would pay "the Partnership" $200,000 in equal monthly installments over ten years on the condition that the partners not engage in the dairy business in northern Alabama and adjoining Tennessee counties during that period. Two days later a formal bill of sale was executed, and the individual agreements not to compete [1] were signed by the partners.

J. Gilmer Blackburn, Decatur, Ala., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, I.R.S., David O. Walter, Stephen B. Wolfberg, Edward L. Rogers, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and McRAE, District Judge.

TUTTLE, Chief Judge.

Emmette L. Barran and C. E. Winton formerly were partners operating the

---

1. Each of the agreements provided in part:
"WHEREAS, Pet Dairy Products Company has acquired the assets of White Way Pure Milk Company, a partnership composed of C. E. Winton and Emmette L. Barran, with principal place of business in Decatur, Alabama, and

"WHEREAS, said Company desires and intends to take over the operation of the business of said White Way Pure Milk Company and serve the customers thereof,

"NOW, THEREFORE, in consideration of the payments to be made as hereinafter set forth, the said * * * individual covenants and agrees with the Company, its successors and assigns, that he will not engage, either directly or indirectly, either for himself or as agent or servant of any party engaged in a similar

The bill of sale recited the particular assets that were being sold and apparently included all of the partnership's assets, except the 200 frontage foot lot adjacent to the plant property and two automobiles used by the partners. No reference was made in the documents to good will or Pet's right to use the trade name "White Way Pure Milk Company." Winton in 1958 conveyed his interest in the one lot remaining in the partnership to Barran, who developed it for a grocery chain.

Pet took over the business as of November 1, 1957, and continued operations in the same geographical area. Although letters were sent out informing customers that Pet had purchased the business, the organization remained generally the same, including substantially all of the routemen, who were White Way's primary contacts with its customers. The White Way name was retained on the plant and on the milk cartons for at least several months.

It had been the practice of the partnership's accountant to prepare monthly income statements which included a valuation of the inventory. For the month of October 1957 the inventory list was prepared and a count made, but the items were not priced. The accountant had been informed that the inventory was to be sold for $10,000 and merely noted that "Estimated Trade Inventory" was $10,000. In computing the cost of goods sold for income tax purposes, initial inventory was added to purchases during the year, and $10,000 was deducted as the value at which the inventory of milk and dairy products was included in the sale. Also, the sale of expendable supplies and inventory was treated as the sale of partnership assets resulting in long-term capital gains. The $833.33, which each partner received in 1957 as the first monthly installment of the sum due under the agreements not to compete, was reported as ordinary income.

Upon examining the returns the Commissioner determined that the proper valuation of the inventory sold was actually $17,770.49, and he increased the partnership's ordinary income by $7,770.49, decreasing the net long-term capital gains by the same amount. Furthermore, $9,171.95 of the sales price was found to represent the portion of the purchase price for expendable supplies in the sale; this was determined to be a short-term capital gain. Deficiencies were assessed in the amounts of $2,626.08 against the Barrans and $2,732.25 against the Wintons. Taxpayers sought review in the Tax Court of these determinations and also questioned whether the amounts received under the agreements not to compete should have been treated as ordinary income rather than as capital gains derived from the sale of good will. The Tax Court held that under the October 30 and November 1 agreements, Pet purchased specific partnership assets and not partnership interests; hence the appropriate treatment of gains depended on the nature of each particular asset and the length of time that asset had been held.

business, or as the owner of stock in any corporation now existing or which may hereafter be formed * * * in the business of buying, receiving, shipping, processing, dealing, or in [sic] vending dairy products for a period of one hundred twenty (120) months from and after the date hereof within the [twenty-four named Alabama] counties * .* * and adjacent counties in Tennessee.

"The said Company, in consideration of the agreement of said individual, covenants and agrees to pay to him the sum of $833.33 per month for one hundred twenty (120) consecutive months, the first payment to be made on December 1, 1957, and a like amount on the 1st day of each succeeding month * * *; provided that at the time each of said payments become due and payable the said * * * individual herein has fully complied with the terms of this agreement as hereinbefore set forth.

"In the event that said individual shall fail to comply in all respects with the terms of this agreement, as hereinbefore set forth, then upon such default upon his part all future payments shall cease and determine, and the Company shall have no further liability in respect thereof and shall not be required to make any further payments to said individual."

The parties also stipulated that in the event of the death of either partner, payments would be made to that partner's estate.

Thus the sale of the items of expendable supplies and inventory, which the Tax Court agreed were properly valued at $9,171.95 and $17,770.49, were found to give rise to short-term capital gains; the taxpayers were unable to carry their burden of proof on the actual holding period of the nearly 750,000 individual items in the category of expendable supplies.

Taxpayers' specifications of errors in this Court raise two main issues. First, did the Tax Court err in holding that the payments made to taxpayers under the agreements not to compete constituted ordinary income rather than the sale of the good will of their business? Next, was it error to treat the gain realized on the sale of the inventory and expendable supplies as a short-term capital gain? The Commissioner argues that even if the Tax Court's finding, that the sale was one of assets only, in which the appropriate holding period is that of the individual assets, was not proper then the ruling that the gains realized from the sale of inventory and expendable supplies were ordinary income and short-term capital gains should not be disturbed on the alternative ground that their values should be subtracted from the partnership's cost of operations thereby increasing ordinary income by that amount.

On the first issue taxpayers argue that the covenants not to compete effectuated a conveyance of good will and that the payments under them should be treated as capital gains. They object that there was an actual conveyance of good will which the Tax Court disregarded merely because the written instruments omitted any reference to it. We recognize it is not necessary to use the words "good will" if in fact the transfer enables the purchaser to "step into the shoes of the seller." See Estate of Masquelette v. Commissioner, 239 F.2d 322, 325 (5th Cir. 1956). In the case before us Pet took over the operation of White Way's business with the stated purpose to "serve the customers thereof." The plant operation continued uninterrupted, the same customers were served, the employees were the same, and Pet even con-tinued for a time to utilize the White Way name. Good will has been described as

"the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." Story, Partnerships § 99.

In the dairy products field, customer routes are apparently a very important factor in the economic success of a business. Here, there was no mention made of milk routes or customer lists, in the contract, but Pet obtained the benefit of these by continuing to employ the route men and from the transferred accounts receivable. Pet also made some use of the partnership's trade name after the purchase, although this was not expressly transferred by the contracts. Thus Pet, by acquiring White Way's physical assets by purchase and by retaining the personnel, effectively stepped into the shoes of the sellers and acquired whatever good will White Way possessed.

This does not, however, resolve the critical question whether the payments not to compete were in essence consideration for the transfer of good will. The Commissioner urges that White Way's good will, if any, attached to the tangible assets sold and hence that the $550,000 paid for the items covered in the bill of sale also included the consideration for the transfer of good will. As evidence of this it is pointed out that the price paid was substantially in excess of the value of the assets transferred. Nevertheless, if an agreement not to compete is necessary to effectuate a transfer of good will, then the payments made under it may be treated as if made for the sale of a capital asset. See Estate of Masquelette v. Commissioner, supra; 3B Mer-

tens, Federal Income Taxation § 22.33, at 148. Taxpayers understandably contend that this is the case here. They offer as a test for determining whether the payments should be so treated a formula turning on the recipients' relationship to the good will. In a situation where the covenantors have no direct interest in the good will, as in Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), where the good will belonged to the corporation but the covenantors were stockholders, taxpayers admit that the payments received are ordinary income. On the other hand, where the owners of the good will agree not to compete, taxpayers urge that this agreement by its very nature is one necessary to convey the good will and the payments thereunder should be treated as if made for good will, as in Toledo Newspaper Co., 2 T.C. 794 (1943). Since the restrictive covenants in the case at bar were made by partners in connection with a sale by a partnership of its good will, taxpayers conclude that the resulting monthly payments must be for good will.

The generally accepted test for covenants of this type, however, is not as simple as that suggested by taxpayers. It is, rather, whether "the covenant is so closely related to a sale of good will that it fails to have any independent significance apart from merely assuring the effective transfer of that good will." Ullman v. Commissioner, supra, 264 F.2d at 307–308. If it is not so related then the amount paid is ordinary income to the covenantor and an amortizable item for the covenantee. The legal distinction between the shareholders and the corporate owner of the good will did play a part in the determination in Ullman that the taxpayer-covenantors did not sustain their burden of showing that the covenants had no significance apart from a transfer of the good will of the businesses. In other cases, too, the existence of a corporate entity between the covenantors and the good will transferred has been found to indicate that the covenants were severable items giving rise to ordinary income and amortizable assets. E. g., Commissioner v. Gazette Tel. Co.,

209 F.2d 926 (10th Cir. 1954); Hamlin's Trust v. Commissioner, 209 F.2d 761 (10th Cir. 1954).

Conversely, a close connection between the good will to be transferred and the covenantor furnishes an argument that the covenant is one necessary to accomplish the transfer of good will. As an example, two partners in a Texas accounting partnership sold their interest in the intangible and tangible assets, including office quarters, files, correspondence, etc., at their El Paso office and agreed not to compete within a radius of 100 miles of El Paso. In Estate of Masquelette v. Commissioner, supra, we found that a conveyance of the partnership's good will was intended and that the restrictive covenants were a nonseverable part of the conveyance. There was no separate consideration for the agreement not to compete. The sale of a professional practice, the success and good will of which depends almost entirely on the individual skill and reputation of the practitioners, would be a hollow ceremony if the sellers could immediately resume their practice in competition with the buyers. The covenant not to compete in that case was an absolute necessity to assure that the partnership's business did not follow the selling partners. Another Fifth Circuit case, Commissioner v. Killian, 314 F.2d 852 (5th Cir. 1963), held that an insurance man who sold his policy renewal records and agreed not to sell insurance in the area for five years realized only a capital gain from the sale of good will. In this case, too, there was only a lump sum stated as payment for the sale of assets and the restrictive covenants; in neither of these cases did the parties make an effort to allocate portions between the selling price of the assets and consideration for the undertaking not to compete. In neither case was there any indication that an item separate and apart from good will was actually dealt with. Cf. Hamlin's Trust v. Commissioner, supra, 209 F.2d at 765. There are, of course, instances where the sale of an individual's partnership interest is accompanied by his covenant not to compete

which is separate and distinct from the transfer of good will. See, e. g., Levine v. Commissioner, 324 F.2d 298 (3d Cir. 1963); Wilson Athletic Goods Mfg. Co. v. Commissioner, 222 F.2d 355 (7th Cir. 1955).

The test of whether a covenant is "severable" or "nonseverable" has been criticized in Schulz v. Commissioner, 294 F.2d 52 (9th Cir. 1961), citing 3B Mertens, op.cit. supra § 22.33, at 150. The criticism is based on the proposition that any covenant which has economic reality must contribute to good will; an inquiry into whether the covenant is or is not severable has little probative value in deciding the controlling issue of whether the covenant has such reality. 294 F.2d at 55–56. The fallacy in this approach is its focus on the good will of the buyer rather than on that of the seller. Under this reasoning, any naked covenant not to compete, although not associated with a transfer of assets, could escape ordinary income treatment as an increment to good will so long as the covenant has "economic reality." To borrow an example from the Schulz case, the friendly bartender who had no business to sell would undoubtedly be happy to take an amount from a competitor equal to his earnings in the form of payments not to compete giving rise to capital gains rather than ordinary income; a rival tavern owner willing to pay the bartender solely for his promise to quit tending bar in that area might well realize an economic benefit from the decreased competition. Thus the covenant has economic reality; what the bartender receives, however, is ordinary income just the same as compensation for performing affirmative services. See, e. g., Beal's Estate v. Commissioner, 82 F.2d 268 (2d Cir. 1936). Nevertheless, the test of "genuineness" of the covenant was appropriate in the Schulz case for the covenant there was patently a sham. The idea of designating a portion of the purchase price as payment for the covenant not to compete was one which the buyers slipped into the negotiations at the end purely for their own tax purposes. Moreover, the facts

that the covenant covered a minimal area and time, that the covenantor had no intention of competing, and that the covenantor did not have the necessary background or contacts to compete convinced the court that the covenant was a mere form with no meaningful substance. This type of analysis could also be properly used on the facts of Commissioner v. Killian, supra, to find there was no payment separable from the amount paid for assets. In Killian the covenantees knew that the covenantor was being forced by poor health to go to Florida and would not have to be paid to stay out of the covenantee's business area in Ohio. See also Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir. 1962).

Applying first the threshold test of genuiness to the covenants in the case at bar, there is little question that they had a basis in economic reality. The vice president of Pet testified that he would not have purchased the assets of White Way without the covenant not to compete. The partners built up their business with customers they took from another dairy business for which they worked, and Pet feared that they might start another operation in competition with Pet.

On the issue of the character of the covenants, it is important that the parties themselves in their agreements placed a separate value on the covenants not to compete. These covenants were the subject of much negotiation and discussion. The partners sought unsuccessfully to have Pet post security, and their attorney testified that he hassled a good while with Pet before reaching an understanding that in the event of the death of either partner, any remaining payments would be made to the partner's estate. It has been said that when parties to this type of transaction specifically contract for the covenants and give them an assigned value, strong proof must be adduced to overcome the declaration. Ullman v. Commissioner, supra at 264 F.2d 308, approving Hamlin's Trust v. Commissioner, supra 209 F.2d at 765. Rogers v. United States, 290 F.2d 501 (9th Cir. 1961), held that it was proper for the

trial court to refuse to look beyond the agreement in which the parties set out a specific amount for a restrictive covenant and to treat the amount as ordinary income.[2]

■ We think the Tax Court was justified in finding the strong proof lacking in this case. There is no evidence to support taxpayers' contention that the $200,000 was merely a deferred payment on the purchase price; that the monthly payments were for the undertakings expressed in the covenants is indicated by the provision that payments are to terminate on the failure of the partners to comply with the agreement. Moreover, the facts of the case are susceptible to the interpretation that the covenants were not necessary to effectuate a conveyance of good will. The good will was that of the White Way Pure Milk Company as a going concern. Customers were used to dealing with White Way routemen and consuming dairy products bearing the White Way name. The partners did not know the customers; the routemen were the representatives of White Way who dealt with the public. Under these circumstances the restrictive arrangement may be viewed as one which Pet might have been willing to make with any vigorous experienced local potential competitors without reference to a sale to prevent the partners from using their acumen, industry, and skill to build a rival operation rather than one necessary to wean White Way's customers from Barran and Winton. The Tax Court was therefore not in error in holding that the payments must be treated as ordinary income.

Taxpayers next complain that the Tax Court erred in treating the sale to Pet as one of individual assets rather than a sale of their partnership interests. It is conceded that the gain on the sale of an entire partnership interest is taxable as a capital gain, the nature and amount of which are measured by the nature and basis of the interest instead of that of the individual assets. Int.Rev.Code of 1954, § 741; see Commissioner v. Smith, 173 F.2d 470 (5th Cir. 1949). The Tax Court, however, found that there had been no transfer of partnership interest since the documents referred only to specific assets and not to partnership interests and the partnership was at the time of the sale negotiating with a grocery chain for the lease of the one remaining parcel of land not transferred to Pet.

It is not necessary to effect a transfer of partnership interests to have specific references in the documents to partnership interests. Thornley v. Commissioner, 147 F.2d 416 (3d Cir. 1945), held the Tax Court erred in holding there was no transfer of partnership interests in a transaction evidenced by documents referring only to the partnership assets but in which all of the partnership interest was conveyed. Moreover, in Hatch's Estate v. Commissioner, 198 F.2d 26 (9th Cir. 1952), the transfer of a partnership's going business except for cash, two automobiles, its firm name, and its automobile sales and service franchise was found to be a sale of partnership interests although the agreements referred only to assets and the partnership survived the sale. That case, we believe, is legally indistinguishable from the one at bar. Although the agreements speak in terms of the sale of assets by the partnership, the documents also treat White Way as coextensive with the partnership and indicate that Pet is to take over the

---

2. The courts that have contributed to the jurisprudence in this field seem to hold that where the parties bargain at arm's length over the terminology to be used in expressing an agreement not to compete and conclude with a specific agreement including a separately stated consideration not to compete, this amounts to something like a bargain between them that the seller, covenantor, will assume the unfavorable tax consequences flowing from the receipt of the consideration and the purchaser will get the corresponding tax benefits. See Yandell v. United States, 208 F.Supp. 306, 308, D.C.Oregon, Aff. P.C. (9th Cir. 1962) 315 F.2d 141. We need not go so far in order to agree that there is a heavy burden on the taxpayer in such a situation. Cf. Nelson Weaver Realty Co. v. CIR, (5th Cir. 1962) 307 F.2d 897, 904.

operation of its business. In the sale transaction assets totaling $550,000 were transferred. What remained after the sale was a piece of land, a half interest in which was sold for $17,500. The land was apparently not used in the partnership business nor for anything else. Although the partnership had negotiated to develop it for commercial use, there is no indication of any such activity after the transfer of assets to Pet. Moreover, the evidence shows no business activity whatsoever engaged in by the partnership after November 1, 1957; no income was generated after that time. Under these circumstances we find that in substance the transaction was a sale of partnership interests, and the Tax Court erred as a matter of law in not so construing it. See Thornley v. Commissioner, supra 147 F.2d at 420.

Since the Tax Court decision cannot be upheld on the ground that the sale was one of specific partnership assets rather than partnership interests, we are left with the Commissioner's alternate theory to support the deficiency assessment. That theory deals with the proper reporting of the partnership's operating income for 1957 and is, in effect, that the items referred to in the deficiency assessments as improperly classified in the sale were actually improperly deducted from income. The item of expendable supplies, which the Tax Court found to be $9,171.95 of the sale price, should, according to the Commissioner, be restored to the partnership's income account. The partnership, it is said, regularly deducted as expenses the amounts paid for expendable supplies; since $9,171.95 worth of supplies were transferred to Pet, this amount of expendable supplies was not used in the production of income. Similarly, the Commissioner contends that the valuation placed on the inventory transferred to Pet, $17,770.49, should also be used as the closing inventory in determining cost of goods sold, rather than the $10,000 which was actually used. Since the closing inventory is deducted from the cost of goods sold, the net effect of the increase in value of the final in-

ventory would be a like increase in partnership income for the year. These adjustments to income were not, however, litigated below, and as taxpayers point out there may be additional factual issues to be resolved, such as whether the sales price of the inventory should be the same as final inventory and whether the expendable supplies were actually expended. We therefore remand this case to the Tax Court to determine what adjustments, if any, should be made in the partnership's income for 1957.

Affirmed in part, reversed in part and remanded.