VISADOR COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Visador Co. v. Commissioner
Docket No. 316-72
United States Tax Court
T.C. Memo 1973-173; 1973 Tax Ct. Memo LEXIS 118; 32 T.C.M. (CCH) 825; T.C.M. (RIA) 73173; August 6, 1973, Filed *118 In 1961 petitioner's predecessor partnership purchased all of the capital stock of Quality Door-Lite and Louver, Inc., for a stated purchase price of $325,000 plus the net worth of Quality, and also by separate contract acquired a covenant not to compete from Quality's two stockholders for a stated consideration of $25,000. Held, petitioner has failed to show by strong proof that the $325,000 was paid for the covenant not to compete. George F. Smith and Robert C. Johnson, for the petitioner James N. Mullen, for the respondent. 2 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge : Respondent determined deficiencies in petitioner's Federal income tax as follows: Tax Year Ended
Deficiency February 28, 1965
$17,148.89
February 28, 1966
18,195.00
February 28, 1967
15,050.00
February 29, 1968
14,371.71
*119 This case arises from a transaction in 1961 whereby a partnership which was subsequently incorporated to form petitioner obtained all the stock of a rival corporation and a covenant not to compete from the shareholders of that corporation. The primary issue for decision is whether a purported contractual allocation of consideration between the stock and the covenant is to be respected for tax purposes. If it is to be respected, then subsidiary questions are presented as to the amount of the amortization deductions which should be allowed petitioner as to the years in question and as to petitioner's allowable charitable contributions for those years. FINDINGS OF FACT Some facts have been stipulated and are so found. Petitioner, Visador Company, a Texas corporation with its principal offices in Jasper, Tex., was incorporated on March 1, 1964; prior to that date, and at the time of the transaction here in question, Visador was operated as a 3 partnership. Since its incorporation, petitioner has maintained its books and records on the accrual basis. Petitioner filed corporate tax returns for the fiscal years here involved with the district director of internal revenue, *120 at Austin, Tex. Petitioner manufactures and sells prefabricated door lites (glass windows of various designs inserted into a door by means of special tools) and louvers (shutter-like vents made of fixed slats inserted into a door for ventilation). Petitioner had been the first to introduce prefabricated door lites an louvers into the market, but in the middle and late 1950's it encountered substantial competition from Quality Door-Lite and Louver, Inc., which was marketing under the aegis of the Coffman Stair Company. Quality Door-Lite had been incorporated in 1954 by Dwight and Willis Coffman to enter the prefabricated door lite and louver market. At that time, and at the time of the transaction here in question, the Coffmans were employees of Coffman Stair Company, which was controlled by their father and uncle. Coffman Stair Company was well established and widely known in the woodworking industry with a good reputation for quality products. When the trend toward ranch-type housing reduced the demand for Coffman products, Dwight Coffman had tried, and failed, to interest his father in expanding Coffman Stair Company to enter the door lite and 4 louver market directly; *121 Dwight and Willis Coffman did, however, secure their father's consent to starting Quality as a separate corporation. Quality had an initial capitalization of $25,000, but within about 4 years had an annual taxable income of more than $100,000; its net worth as of May 31, 1961, was $297,239.56. Dwight Coffman was president of Quality; Willis Coffman was vice-president and treasurer. Quality's offices and plant were in a different location than Coffman Stair Company's, though both were located in Washington Court House, Ohio. Quality maintained its own books and records, paid its employees with checks drawn on its own bank accounts, and filed its own Federal corporate income tax returns. Quality did, however, market its products under the Coffman Stair Company name, buy finished moldings from Coffman Stair Company for use in door lites, bill through Coffman Stair Company, and pay Coffman Stair Company's bookkeeper to keep Quality's books as well. Quality's name was not known in the door lite and louver industry, its products were identified in its customers' minds with Coffman Stair Company. In early 1961, Dwight Coffman negotiated with Don Hall, Robert J. Hall, and J. D. Hall, *122 Jr., three of the partners of the (then) Visador partnership, regarding the possibility of a sale to the partnership of the Coffmans' door lite and louver business. Dwight Coffman's initial asking price 5 was $400,000; however, the parties ultimately agreed on a total price of $350,000, plus Quality's net worth. During the negotiations the Halls requested, and the Coffmans agreed to give them, a covenant not to compete for 5 years. It was agreed that $25,000 of the purchase price should be allocated to the covenant. Shortly after Quality had started operations, Dwight Coffman had taken Don Hall to see the Quality plant, located on South Main Street in Washington Court House in a building leased from, and once used as a warehouse by, Coffman Stair Company. The same evening, Coffman took Hall to see the Coffman Stair Company plant, located on Sycamore Street. Shortly before the transaction here at issue, Dwight Coffman took Don Hall and J. D. Hall, Jr., to Quality's plant, which had been moved to Highland Avenue, a mile and a half from the Coffman Stair Company plant, and opened all of Quality's records to them. The negotiations between Dwight Coffman and the Halls culminated *123 in two written contracts. The first was a contract of sale [1] whereby the Visador partnership was to purchase 6 all of Quality's stock from Dwight and Willis Coffman for total consideration of $325,000 plus Quality's net worth, an additional $297,239.56, all to be paid in installments, with interest. The Visador Company had the right, however, to convey any of Quality's assets to the Coffmans, at any time prior to January 15, 1962, in part payment of the total purchase price. The second contract was a covenant by Dwight and Willis Coffman, individually, not to compete with Visador for a period of 5 years. The covenant carried consideration of $25,000, also payable in installments, but without interest. [2]
*124 7 On its own books, Visador recorded payments to Dwight and Willis Coffman under three accounts entitled: (1) For Quality Door-Lite & Louver, Inc., - $297,239.56; (2) for agreement not to compete - $325,000; (3) for covenant not to compete - $25,000. Before January 15, 1962, Visador returned to the Coffmans $125,176.88 of non-cash Quality assets. Visador retained $172.062.68 of Quality's net assets, primarily in the form 8 of cash, trade, accounts receivable, and inventories. Prior to closing, as required by the sales contract, Visador had paid the Coffmans $5,000 in cash. Between the closing date and February 29, 1968, the Visador partnership and corporation had made payments to the Coffmans as follows: 9 PAYMENTS AS MADE AND RECORDED ON BOOKS Date
Total paid
For Quality Door-Lite & Louver, Inc.
An account entitled "For Agreement Not To Compete
An account entitled "For Covenant Not To Compete"
Method of payment Y/E 2/28/62
5/31/61
$5,000.00
$5,000.00
Money
Closing
67,128.81
32,067.43
$35,061.38
(Coffman Note
Closing
5,983.47
2,858.32
3,125.15
(Returned
Closing
19,423.64
9,278.66
10,144.98
(Coffman Life
Closing
25,000.00
11,942.50
13,057.50
(Insurance
7/61
416.66
$ 416.11
Money
8/61
416.66
416.66
Money
9/61
1,464.08
699.37
764.71
Money
9/61
416.66
416.66
Money
10/61 8,000.00
3,821.60
4,178.40
Money
10/61
416.66
416.66
Money
11/61
8,000.00
3,821.60
4,178.40
Money
11/61 416.66
416.66
Money
12/61
8,000.00
3,821.60
4,178.40
Money
12/61
2,000.00
955.40
1,044.60
Money
12/61
416.66
416.66
Money
1/62
32,640.96
15,592.59
17,048.37
Title to Quality Hard Assets Returned
1/62
543.73
259.74
283.99
Business Ins. Returned
1/62
16,815.31
8,032.67
8,782.64
Money
1/62
416.66
416.66
Money
1/62
5,000 .00
2,388.50
2,611.50
Money
2/62
5,000.00
2,388.50
2,611.50
Money
2/62
416.66
213,333.28
102,928.48
107,071.52
3,333.28
Money
Y/E 2/28/63
64,999.92
28,620.00
31,380.00
4,999.92
Money
Y/E 2/29/64
64,999.92
28,620.00
31,380.00
4,999.92
Money
Y/E 2/28/65
64,999.92
28,620.00
31,380.00
4,999.92
Money
Y/E 2/28/66
169,999.92
78,820.50
86,179.50
4,999.92
$125,000.00 in Visador stock, rest in money
Y/E 2/28/67
44,167.04
20,302.25
22,197.75
1,667.04
Money
Y/E 2/29/68
24,739.56
9,328.33
15,411.23
Total 61-68
647,239.56
297,239.56
325,000.00
25,000.00
*125 10 The partnership amortized on its books and on its tax returns during the period 1961-1964 $169,747.52 for the "agreement not to compete" and $13,333.16 for the "covenant not to compete." On March 1, 1964, Visador Company was incorporated and acquired all of the partnership's assets and liabilities. On its tax returns for the fiscal years ending February 28, 1965, through February 29, 1968 - the tax years now at bar - Visador Company amortized $125,352 with respect to the "agreement not to compete" and $11,666.88 with respect to the covenant not to compete. After execution of the sales contract, Dwight and Willis Coffman and the partnershipacted to transfer to Visador such goodwill as Quality enjoyed from its marketing under the Coffman Stair Company aegis: The partnership wrote to Quality's former customers announcing that it had acquired the "Coffman Door Lite and Louver facilities;" Dwight Coffman and Don Hall made at least one trip of about 3 weeks visiting former customers of Quality in several States and urging them to shift their business to Visador; and Dwight Coffman, in addition, wrote letters and made telephone calls to former Quality customers asking them to *126 do business with Visador. At the time of the instant proceedings, the Coffmans owned one-third of the stock of Visador Company and Dwight Coffman was Visador's vice-president. 11 OPINION The primary issue for decision is whether $325,000 of the stated purchase price for the stock of Quality was actually paid for a covenant not to compete by Quality's stockholders, thus permitting petitioners to amortize the cost of the covenant. The contract of sale specifically provided that the purchase price of the stock was $325,000 plus the net worth of Quality, and that a separate and independent contract calling for a consideration of $25,000 was to cover a covenant not to compete. Petitioners contend that the entire $350,000 was paid for the covenant not to compete. The parties appear to have assumed that when petitioner was incorporated in 1964, the transaction took the form of a transfer by the partnership of its assets and liabilities to petitioner in exchange for petitioner's stock, with a subsequent distribution of the stock by the partnership to the partners, so that the partnership basis in its assets carried over to petitioner. There is no indication in the record that *127 the transaction took a different form; thus that assumption will be followed here. [3]
Basically, when parties to a transaction such as the one here involved, after arm's-length negotiations, allocate a 12 part of the purchase price to a particular asset, that allocation will ordinarily be respected for tax purposes because, as said in Ullman v. Commissioner, 264 F. 2d 305: The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with refernce to the covenants [not to compete], and the true value of them in money. While recognizing that the parties to a transaction cannot contractually preclude the Commissioner from attacking an allocation of the purchase price which has no basis in economic reality, Dixie Finance Co., Inc. v. United States, F. 2d , (C.A. 5, 1973), affirming a Memorandum *128 Opinion of this Court, this Court and the United States Court of Appeals for the Fifth Circuit have long recognized that when parties to this type of transaction specifically contract for the covenants and give them an assigned value, strong proof must be adduced to overcome the declaration. Barran v. Commissioner, 334 F. 2d 58, affirming 39 T.C. 515; Balthrope v. Commissioner, 356 F.2d 28, affirming a Memorandum Opinion of this Court. [4]
*129 13 The strong proof that must be adduced by a taxpayer to establish a position for tax purposes at variance with the terms of an agreement to which he was a party must show either that the provision of the agreement had no economic reality and was a sham, or that the language of the agreement did not reflect the true intentions of the parties. We think petitioner has failed to carry that burden of proof with respect to either alternative in this case. The pattern developed in most of the cases cited to us involved an effort by the seller to prove that the covenants not to compete had no economic reality which would support the payments therefor provided in the agreement and that the payments received were actually for capital assets. Here petitioner is the buyer claiming that the entire purchase price was paid for the covenant not to compete, so almost the entire thrust of its evidence is that there was no economic reason for it to pay any amount in excess of book value for the stock of the company, that the only thing it was interested in buying from the Coffmans was their covenant not to compete, and that the terms of the contract were drafted by the Coffmans to give them *130 a tax advantage and did not reflect the true purpose for the $325,000 payment. There is no question in this case that the covenant not to compete had economic reality and was important to the petitioner. The Coffmans had proved that they could enter the door-lite business and provide stiff competition for 14 petitioner. So it would have been foolish for petitioner to buy Quality without a covenant not to compete from the Coffmans. However, it is not as clear as petitioner would have us believe that there was no economic reason for them to buy and pay a premium for the stock of Quality, as the contract provided. The evidence supports petitioner's claim that Quality was not known in the door-lite business because its products were advertised and sold under the name of Coffman Stair Co. This was done because the Coffman Stair Co. had an established reputation in the woodworking field. But the evidence also shows that Quality was a viable corporation and that the door-lite business was its business. The principal stockholder of Coffman Stair Co. had refused to premit the Stair Company to enter the door-lite business, so his sons, the sellers in this transaction, had formed *131 Quality for that purpose. Quality had its own employees who were paid through its own bank accounts, had its own books and records in which it accounted for the income and expenses of the door-lite business, filed its own corporate tax returns, and had its own separate place of business. Petitioner's evidence does not support its claim that Quality was a sham; only that Quality was not known as such in the door-lite industry and by its customers. Petitioner argues that Quality had no goodwill or any other assets that petitioner wanted or needed and that it did not intend to pay anything for Quality's stock in excess of its book value; therefore, the $325,000 had to be and was 15 intended to be payment for the covenant not to compete. The evidence does not necessarily support this argument. It is clear that what Visador wanted was to get the Coffman's and their corporation out of the door-lite business and that this is what they were willing to pay for. In order to accomplish this they had to acquire control of the Coffman's door-lite corporation as well as get a noncompete agreement from the Coffmans. It was the corporation that apparently had the right to market its products *132 under the Coffman Stair Company name; the Coffman sons did not own the goodwill or reputation of the Stair Company. Possibly the petitioner did not need the physical assets of Quality; the machinery used is apparently common to the woodworking industry and is not unique to the manufacture of door lites and louvers. But to accomplish its purpose of eliminating the Coffman's from the door-lite business, Visador had to assure the dismantling of Quality and discontinuance of its business operations. The best, and possibly only, way this could be accomplished was buying the stock or assets of Quality. Getting the Coffman sons out of the business personally through a noncompetition agreement would have been of little solace to Visador if the company the Coffmans had built up could continue as a going concern in the same nammer as before, 16 except without the services of the Coffman sons. An agreement from the Coffmans not to compete would not preclude Quality from continuing its marketing arrangements with Coffman Stair Company. [5] It was, therefore, important to Visador to acquire Quality's inventories, records, accounts receivable 17 customer lists, and whatever goodwill it *133 had. These assets would be valuable to Visador in a negative fashion, at least. *134 Furthermore, Visador obviously did benefit from buying the stock of Quality and along with it the right to advise Quality's customers that it had bought out the business that produced Coffman Stair Company door-lites and louvers and that they should thereafter look to Visador to supply their needs for those quality products. This they could not have done without buying both the corporate stock of Quality and the non compete agreement from the Coffmans. The Coffmans were in a position to insist on this form of transaction and apparently did so. It may be that the allocation of only $25,000 of the $350,000 purchase price to the covenant not to compete was unreasonable or unrealistic, but petitioner has failed to provide us with any evidence to make a different allocation. There is evidence that the parties discussed the allocation of the purchase price and that the allocation made in the contract of sale was agreeable to all parties and reflected the intentions of all parties at the time the agreement was executed. There is no evidence that the representatives of Visador did not read or understand the terms of the contract at the time they signed it; and it is very clearly stated *135 in the contract of sale that $325,000 was for the purchase of stock and $25,000 was for the covenant not to 18 compete, which was made the subject of a second agreement. We also note that the deferred payments under the contract of sale bore interest while no interest was payable on the deferred payments under the covenant agreement. There could have been no misunderstanding as to the terms of the agreement. The fact that the Hall's may not have been fully aware of the tax consequences of the allocation will not permit them or Visador to avoid the allocation without strong proof that they did not agree to that allocation. Hamlin's Trust v. Commissioner, 209 F.2d 761, Edmond E. Maseeh, 52 T.C. 18. Petitioners have fallen short of presenting strong proof that they did not understandingly agree to the allocation made in the contract. Balthrope v. Commissioner, supra.
Petitioner having failed to present adequate proof that the allocation of the purchase price made in the contract was economically unrealistic and was not what the parties intended, we will not revise the negotiated contract for petitioner for tax purposes. Benjamin Levinson, 45 T.C. 380. *136 Petitioner has failed to prove that the $325,000 was paid for the covenant. The above conclusion leaves us with a subsidiary issue of whether petitioner is entitled to any deduction for amortization of the cost of the covenant not to compete in the years here involved. Respondent's position is that prior to the years here involved, petitioner or its predecessor had deducted on its tax returns a total of $183,080.68 for amortization of both the "covenant not to compete" and the "agreement not to compete" - $13,333.16 for the former and 19 $169,747.52 for the latter - and that petitioner, therefore, had no remaining basis in the covenant not to compete to amortize during the years at issue. Clearly Visador is entitled to deduct the $25,000 it paid for the covenant not to compete ratably over the 5 years of its useful life under sections 167(a), (b), and (c). Respondent is not justified in charging the amounts erroneously deducted by petitioner in prior years for amortization of the "agreement not to compete" against petitioner's basis in the "covenant not to compete." The two items were consistently reflected on petitioner's books as separate items and respondent has considered *137 them as such in his approach to this case. The partnership and petitioner claimed no greater amounts in prior years for amortization of the $25,000 paid for the covenant not to compete than it was entitled to. It follows that respondent has erroneously disallowed the following deductions for amortization of the "covenant not to compete" in the following years: Tax Year Ended
Deduction Feb. 28, 1965
$4,999.92
Feb. 28, 1966
4,999.92
Feb. 28, 1967
1,677.00
Respondent is sustained in disallowing the remainder of the deductions claimed for amortization of the "agreement not to compete" for the years here involved. 20 The allowable deductions for contributions calimed by petitioner in the years here involved will be recomputed in the light of our conclusion above and the stipulation of the parties. Decision will be entered under Rule 50. Footnotes
1. "WHEREAS, the Sellers desire to sell and the Buyer desires to buy all of the outstanding capital stock of The Corporation; and "WHEREAS, the Sellers are also willing to execute and enter into a contract to refrain from entering into any competitive enterprise for a period of five (5) years as set forth in the attached form of contract marked Exhibit "b", which contract, nevertheless, is an independent contract calling for a consideration of $25,000.00, all as specifically set forth therein, which figure has been separately negotiated and the consideration independently arrived at, "NOW, THEREFORE, in consideration of the mutual promises and undertakings hereinafter set forth, the parties agree as follows: "Sellers jointly and severally agree to sell to Buyer and Buyer agrees to purchase from Sellers, all of the authorized and outstanding shares of capital stock of The Corporation at the price and on the terms, covenants and conditions hereinafter set forth: 1. PURCHASE PRICE "The purchase price of the stock which is the subject of this agreement and which Buyer shall pay to Sellers is $325,000.00 plus the net worth of The Corporation as disclosed by the balance sheet hereinafter referred to and attached hereto as Exhibit "C"." ↩
2. "WHEREAS, The Visador Company a partnership, has purchased from the undersigned all of their stock in Quality Door-Lite & Louver, Inc. an Ohio corporation, being all of the stock of said corporation, and the purchase price paid therefor was based upon both the physical assets of the company and the good will inuring to the company by virtue of the services in its behalf of Dwight E. Coffman and Willis Coffman; and : :WHEREAS, for the consideration hereinafter mentioned as well as to protect the good will of said Ohio corporation, this contract has been made; NOW, THEREFORE, in consideration of the mutual promises hereinafter "(1) Dwight E. Coffman and Willis Coffman jointly and severally agree and covenant with The Visador Company, a parthership of JasperTexas, that neither of them will directly or indirectly, alone or with others, enter upon or engage in the business now engaged in by the above mentioned Ohio corporation in any place in which said Ohio corporation has now and heretofore conducted its present business for so long as The Visador Company or its successors, heirs, and assigns carries on a like business in said territory but not more than five (5) years from the date hereof * * * ." ↩
3. There is no clear indication in the record whether or when Quality may have been liquidated into either the partnership or the petitioner corporation. The evidence suggests that Quality's charter was still viable at the date of trial. ↩
4. Respondent argues that we should apply the more stringent rule of Commissioner v. Danielson, 378 F. 2d 771 (C.A. 3, 1967), in which the Third Circuit held that a party to an agreement fixing explicit amount for the covenant not to compete may not attack the agreement "absent proof of the type which would negate it in an action between the parties." Under Jack E. Golsen, 54 T.C. 404U.S. 940 (1971), we must apply the "strong proof" rule of the Fifth Circuit, to which an appeal in this case would lie. See also Meyer Mittleman, 56 T.C. 171, 175 (1971), where this Court rejected the Danielson rule except in cases arising in the Third Circuit and applied the "strong proof" rule, and Glen W. Lucas, Jr., 58 T.C. 1022, 1032↩, (1972). 5. It appears that one of the most vital assets of Quality which Visador had to acquire to eliminate the competition was the right to market its products as Coffman Stair Company door-lites and louvers, an intangible asset. This was a form of goodwill attached to the Quality products even though it may have been generated by the Coffman name and by the services of the Coffmans. The only way Visador could take advantage of this intangible asset was to be assured of the cooperation of the Coffmans. Thus it could be argued that the covenant not to compete acquired from the Coffmans together with their agreement to make an effort to transfer Quality's customers to Visador was so clearly related to a sale of goodwill of Quality that it fails to have any independent significance apart from merely assuring the effective transfer of that goodwill. See Ullman v. Commissioner, 264 F.2d 305 at 307, 308 and Barran v. Commissioner, 334 F.2d 58 at 62↩.In fact the document containing the covenant not to compete recites that the purchase price of the stock was based upon both the physical assets of Quality and the goodwill inuring to Quality by virtue of the services in its behalf by the Coffmans, and that the consideration mentioned in the covenant agreement ($25,000) was "to protect the goodwill of said Ohio Corporation."